[Cite as *State v. Leu*, 2019-Ohio-3404.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. L-17-1265 |
| Appellee | Trial Court No. CR0201602298 |
| v. | |
| Jackie G. Leu | **DECISION AND JUDGMENT** |
| Appellant | Decided: August 23, 2019 |

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Defendant-appellant, Jackie G. Leu, appeals the October 20, 2017 judgment of the Lucas County Court of Common Pleas which, following a jury trial finding him guilty of attempted murder with a firearm specification, felonious assault, and obstructing

justice sentenced him to an imprisonment term of 17 and one-half years. For the reasons that follow, we affirm.

{¶ 2} Appellant was indicted on July 15, 2016, for the June 12, 2016 shooting of victim, T.J., following an earlier verbal altercation at a bar located in Toledo, Lucas County, Ohio. A second indictment was filed on August 4, 2017, charging appellant with one count of bribery of a witness in the proceedings. The charges in the indictments were set to be jointly tried.

{¶ 3} On October 11, 2017, appellant filed a motion for relief from joinder requesting that the cases be tried separately. Appellant argued, citing Crim.R. 8(A), that no finding had been made that the offenses could have been charged in a single indictment. Appellant further argued that he would be prejudiced by the joinder under Crim.R. 14 and Evid.R. 404(B), in that it undermined his right to a presumption of innocence as to the charges in the original indictment.

{¶ 4} The court addressed the motion on October 16, 2017, the morning of trial. The court focused on the procedural history of the case which included two prior defense attorneys and multiple extensions of the trial date. As to current counsel, the court stated that he had entered his appearance on August 14, 2017, and immediately requested an extension of the August 28, 2017 trial date. On the same date, appellant was arraigned on the new bribery charge. The matter was set for trial on September 18, 2017, and reset for October 16. The court then concluded that the motion was untimely and it was denied.

{¶ 5} The matter then proceeded to a jury trial on all four charges.

2.

**The Shooting**

{¶ 6} At trial several witnesses testified regarding the events preceding the shooting. Asia M. testified that victim, T.J., had recently moved into her and boyfriend Joshua's house on Burger Street in Toledo, Ohio, after breaking up with a girlfriend. On June 12, 2016, at approximately 12:30 a.m., a group including Asia, Joshua, Asia's sister Aishah, and the victim walked to a nearby bar; there they met Asia's friend, Chelsey, and her boyfriend John.

{¶ 7} Shortly before last call, the group decided to leave; Chelsey was already outside smoking a cigarette. Asia stated that at the time, appellant, driving an SUV, drove up onto the curb and sidewalk almost hitting Chelsey. He then exited the vehicle. At that time there were no verbal exchanges and appellant went into the bar.

{¶ 8} Asia testified that her sister returned to the bar to use the restroom and that she and appellant exited at the same time and were talking to one another. According to Asia, after telling her sister it was time to go, appellant began calling her derogatory names. At that point victim T.J. confronted appellant and to prevent a physical altercation, the two had to be separated. Appellant stated that the victim did not know who he was "f***ing with" and in response T.J. yelled to appellant that he could meet him at "312 Burger Street." The group then headed back to Asia's house as they had ordered food to be delivered.

{¶ 9} After arriving home, T.J. stayed outside to smoke a cigarette. The group eventually went outside to see where he was and they found him lying in the street. His

3.

face was blue and his breathing was labored. Asia testified she initially thought he had a stab wound to his neck; she called 911.

{¶ 10} Asia was questioned about informing detectives that earlier that day, T.J. relayed an incident involving a married female co-worker. T.J. told her that he was driving with the woman and they spotted her husband. She told him to duck down because the husband would get jealous

{¶ 11} Joshua P. similarly testified regarding the altercation outside the bar but added that he punched appellant in the shoulder because he believed that appellant was going to try and fight with his girlfriend. Joshua also stated that before they went out to check on T.J. they heard a loud popping noise but thought that it was a car backfiring.

{¶ 12} Joshua stated that the group walked outside when the food delivery arrived. The delivery people indicated that there was someone lying next to a car. Joshua described that T.J. was lying on the ground and not moving; he was blue.

{¶ 13} Chelsey G. and Jonathon A., dating at the time of the shooting, testified that they met the group at the bar that night around last-call. Chelsey was friends with the group but other than T.J., Jonathon had just met them that night. Jonathon stated that they were outside the bar smoking when an SUV pulled up over the curb almost hitting Chelsey. Jonathon said a fight, verbal then physical, broke out. Jonathon stated that after the fight he and Chelsey got in their car and drove to a "house party" on Burger Street.

4.

{¶ 14} As with Asia and Joshua, Jonathon and Chelsey similarly testified that they ordered food and eventually went outside; the delivery people had arrived and noticed T.J. lying in the street with a gunshot wound.

{¶ 15} Brandy F. testified that on the night of the shooting she and her husband were making deliveries for Central Hot Dog. She stated that she pulled up to the Burger Street address, exited the vehicle and almost stepped on the victim. Brandy observed a bullet hole in T.J.'s neck and applied pressure to the wound with a paper towel. Brandy testified that the victim was blue and not moving.

{¶ 16} The victim, T.J., testified that shortly after arriving at the bar, appellant, driving erratically, nearly ran Chelsey over. He stated that there was a "little bit" of an argument at that time. T.J. stated that later it appeared that appellant and Asia were about to get into a fight and he stepped in.

{¶ 17} T.J. testified that he then walked Aishah home (Asia's sister) who lived about one-half block out-of-the-way from the route home. Arriving back at Asia's house, T.J. remained outside to finish a cigarette. T.J. testified that he saw a vehicle approach, saw approximately half of appellant's face, and watched appellant point a gun and shoot him.

{¶ 18} T.J. testified that he was shot in the neck and his spinal cord was completely severed. He has no chance of ever walking again. T.J. stated that he is unable to live alone and can independently perform approximately half of his daily living functions.

5.

{¶ 19} During cross-examination, T.J. was questioned about his married, but separated work friend, Jennifer. On the day before the shooting, T.J. was being driven home by Jennifer when her husband spotted them. According to T.J, the husband pulled in front of her car; the two exited their vehicles and began arguing. T.J. indicated that the husband did yell once for him to get out of the car but otherwise he was ignored. T.J. stated that he did not know if her husband followed them to the Burger address where he was dropped off.

### The Pickup Truck

{¶ 20} Ociel P. testified that on the night of the shooting he was returning to his house on Burger Street when a Ford F150 pickup truck caught his attention because his grandfather had had one. Ociel stated that he turned right onto Burger Street and the truck followed a few houses behind. He pulled into his driveway and the truck passed slowly on the street. Ociel testified that he forgot his cigarettes in his truck so he went back out and saw the truck driving slowly back up the street. He believed the driver to be lost. A few seconds later, Ociel was in the kitchen and heard what sounded like two gunshots. He and his girlfriend looked out the living room window and saw the taillights of the truck speeding away.

{¶ 21} Regarding a description of the truck and driver, Ociel testified that he identified the truck from a photo array compiled by police and he identified appellant as the driver to detectives and in court. Ociel was questioned about the lighting conditions on the street; he indicated that there were various streetlights up and down the street but

6.

none right where the shooting took place. Ociel testified that it looked like appellant was wearing a painter hat during the incident.

{¶ 22} Ociel was cross-examined about his identification of the truck involved in the shooting and the fact that it was an older model, needed body work and had multicolored panels. Ociel stated that four of the six vehicles in the photo array compiled by police had multicolored panels.

{¶ 23} Scott G. testified that he had previously worked for Granger's Automotive as a wrecker driver. Scott testified that he had known appellant for eight to ten years and that they lived one block apart. Scott testified that although he could not remember the specific date, he saw appellant in the early morning of a Sunday, either June 10 or 12, 2016, between 2:00 and 4:00 a.m. when he was on call. Appellant pulled into his driveway in a Ford pickup truck; Scott identified the truck from a state's exhibit. According to Scott, appellant stated that the truck was not running well and asked that it be towed to the automotive shop.

### The Investigation

{¶ 24} Toledo Police Detective, Eugene Kutz, testified that he responded to the crime scene on Burger Street. He conducted approximately six witness interviews and determined that appellant and the victim's friend's husband were potential suspects. Detective Kutz then executed two photo arrays which included the potential suspects to present to the victim; he positively identified appellant as the shooter. With the positive

7.

identification complete, Detective Kutz enlisted Detective Deborah Hahn, whose role was then to identify the vehicle appellant allegedly drove when he shot the victim.

{¶ 25} Detective Hahn testified that she knew appellant as a potential witness in another case and was aware of the vehicles appellant owns including a silver Mercury Mountaineer, a red Ford Mustang, and an older blue pickup truck. Regarding the pickup truck, Hahn further testified to her knowledge of the truck's appearance, such that it was distinct and comprised of various shades of blue. She then searched for trucks of the same make and model, Ford F150, located in the general area of the shooting and colored various shades of blue to photograph for a photo array. The witness positively identified appellant's truck from the photo array.

{¶ 26} Earlier, when Detective Hahn spoke to appellant about the truck's location, he told her it was towed to a repair shop because it had not been running properly. Appellant stated that it had been towed in May. Detective Hahn went to the shop to see the vehicle; she found the truck parked up against a building and a fence and stated that it appeared to be hidden. The tow-truck operator stated to Hahn that he towed the truck on June 12. Detective Hahn had the truck towed to the police impound lot, but did not test it to see whether it operated. A search warrant was obtained for the vehicle; no evidence of the weapon, bullets or shell casings, or powder residue was found.

{¶ 27} Toledo Police Scientific Investigation Unit Detective Terry Cousino conducted an investigation of the crime scene including photographing the area and collecting physical evidence. Cousino collected a 9 mm spent shell casing; he stated that

8.

it did not appear weathered.  Detective Cousino stated that it was very dark at the shooting location.

### Bribery Charge

{¶ 28} Testimony was presented regarding allegations that appellant attempted to bribe the victim, T.J., not to testify.  Kimberly C. stated that he had been friends with appellant for approximately ten years.  According to Kimberly, appellant asked him if he knew the victim's mother.  After Kimberly responded yes, appellant asked him to talk to the mother to make the case "disappear."  Kimberly stated that shortly after the shooting appellant, through Kimberly, offered the victim $10,000 to not pursue the case; the victim refused.  Kimberly acknowledged that he delayed telling police about the alleged bribe until approximately one year later and during the course of his own criminal proceedings.

### Appellant's Case

{¶ 29} Appellant presented the testimony of two witnesses.  Gary F. testified that he was at the bar on the night of the shooting and had played pool with appellant, a longtime friend.  He recalled appellant getting into an altercation later in the evening; he stepped out of the bar and saw appellant on the ground.  Gary stated that he went out, helped appellant up, and took him back into the bar.  He did not know what caused the altercation.  Gary testified that he locked the bar door for 15 to 20 minutes and then walked appellant to his SUV and watched him drive away.

{¶ 30} Finally, Jennifer H., T.J.'s work friend, testified about the violent relationship between her and her estranged husband.  On the date of trial, there was a

9.

protection order in place. On the day of the shooting, T.J. had asked for a ride home from work. On the way, the husband spotted the pair and "flipped his car around" to stop her. Jennifer stated that her husband jumped out of his car and came around to the passenger side and threatened to beat T.J. up. According to Jennifer, her husband was "extremely angry" but left in his vehicle which also had the parties' children. Jennifer speculated that her husband followed them.

{¶ 31} Jennifer stated that when she arrived home, her husband accused her of cheating on him with T.J. Her husband also saw a text message from T.J. inviting her over to play beer pong later that night. Jennifer stated that her husband left her house after 11:30 p.m. and that she had locked herself and her daughters in her room. Jennifer further stated that she had taken a sleep aid and did not know when her husband returned.

{¶ 32} A few weeks after the shooting her husband displayed a gun he was wearing on his hip. Jennifer admitted that she never spoke with police about the incident involving T.J. and her husband.

{¶ 33} Following closing arguments and jury deliberations, appellant was found guilty of attempted murder with a firearm specification, felonious assault with a firearm specification, and obstructing justice. Appellant was acquitted of the bribery charge.

{¶ 34} The matter then proceeded to sentencing with the state electing to proceed on the attempted murder charge. Appellant was sentenced to ten years for attempted murder to be served consecutive to the mandatory five-year prison term for the firearm specification. For obstructing justice, appellant was sentenced to 30 months in prison, to

10.

be served consecutively to the 15-year term for a total of 17 and one-half years in prison. The judgment entry was filed and journalized on October 20, 2017; this appeal followed with appellant raising five assignments of error for our review.

I. The trial court erred to the prejudice of Appellant when it denied his motion opposing joinder of two indictments, which were filed over a year apart, for one trial.

II. Appellant was denied a fair trial by the introduction of an unnecessarily suggestive photo array in violation of R.C. 2933.83.

III. Appellant was denied effective assistance of trial counsel as guaranteed by Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to file a motion to suppress evidence.

IV. Appellant's convictions for attempted murder, felonious assault and obstructing justice are against the sufficiency and manifest weight of the evidence.

V. Cumulative error deprived appellant of a fair trial.

{¶ 35} Appellant's first assignment of error argues that he was prejudiced by the trial court's denial of his motion opposing the joinder of the two indictments for trial. Appellant argues that the court erroneously denied the motion based on procedural requirements rather than on its merits. The court denied appellant's motion because it was untimely. A motion to sever on the basis of prejudicial joinder is a pretrial motion,

Crim.R. 12(C)(5), that is required to be made "within thirty-five days after arraignment or seven days before trial, whichever is earlier," Crim.R. 12(D), although the court in its discretion has the ability to extend the time.

{¶ 36} As set forth in the procedural history above, appellant was indicted for bribery on August 4, 2017. Appellant was arraigned on the charge on August 14, 2017, the same date that his new counsel entered an appearance. The matter was set for trial on September 18, 2017, the date was continued at defense counsel's request to October 16, 2017. Appellant's motion to sever was not filed until October 11, 2017. Based on these facts alone, we cannot say that the trial court abused its discretion denying the motion.

{¶ 37} Even examining the motion on the merits, we still cannot find that the court's denial of the motion to sever was in error. Crim.R. 8(A) provides the standards for determining whether separate offenses can be charged in the same indictment:

> Two or more offenses may be charged in the same indictment * * * if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 38} If a party opposing the joinder of indictments demonstrates prejudice, the trial court shall order separation of the counts under Crim.R. 14. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 20-21, citing *State v. Torres*, 66 Ohio

12.

St.2d 340, 421 N.E.2d 1288 (1981), syllabus. In order to affirmatively show that his rights have been prejudiced by the joinder, the defendant must furnish the trial court with information sufficient to allow the court to weigh the considerations favoring joinder against the defendant's right to a fair trial; to obtain reversal on appeal, the defendant must demonstrate that the trial court abused its discretion in refusing to separate the charges for trial. *State v. Goodner*, 195 Ohio App.3d 636, 2011-Ohio-5018, 961 N.E.2d 254, ¶ 42 (2d Dist.). Accordingly, we review a trial court's decision on severance under an abuse of discretion standard. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).[1]

{¶ 39} Evidence of the attempted bribery of a witness by a defendant is admissible against that defendant since such an attempt demonstrates consciousness of guilt. *State v. Snowden*, 2d Dist. Montgomery No. 28096, 2019-Ohio-3006, ¶ 50, citing *State v. Hunt*, 8th Dist. Cuyahoga No. 84528, 2005-Ohio-1871, ¶ 8. *See also Gordon, supra*, at ¶ 28, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 68. Thus, had the trial court granted appellant's motion to sever, the testimony regarding his alleged attempt to bribe the victim would have been admissible to establish appellant's consciousness of guilt regarding the shooting. Along this vein, had the charges been severed the state would have called several of the same witnesses from the trial on the

---

[1] The state further argues that because appellant failed to renew his opposition to joinder, review is limited to plain error under Crim.R. 52. Because we find no error, we likewise find no plain error.

13.

underlying charges to prove motive in connection with the bribery charge, which would have wasted judicial resources and subjected the witnesses to a second examination. This contravenes the public policy in favor of joinder. *See State v. Stuckman*, 6th Dist. Sandusky Nos. S-17-039, S-17-040, 2018-Ohio-4050, ¶ 36, citing *State v. Scott*, 6th Dist. Sandusky No. S-02-026, 2003-Ohio-2797, ¶ 13. Accordingly, we conclude that the trial court did not err when it overruled appellant's motion to sever. Appellant's first assignment of error is not well-taken.

{¶ 40} Appellant's second assignment of error asserts that he was denied a fair trial by the introduction of the pickup truck photo array. Specifically, appellant contends that the photo array used to identify the truck was in violation of R.C. 2933.83, denying appellant a fair trial because the photo array was unduly suggestive and prejudicial. The statute refers to a photo array used for the purpose of identifying a suspected perpetrator. "Perpetrator" is defined as "the *person* who committed the offense." (Emphasis added.) R.C. 2933.83(A)(9). Appellant argues that the language and procedural requirements in R.C. 2933.83 should encompass both human suspects and inanimate objects. While Ohio precedent is unclear at this time, courts in other states have consistently held that objects are not afforded the same identification procedures and constitutional protections as are human suspects. For example, the Pennsylvania Supreme Court ruled:

> There is a difference between an identification of a defendant and of an inanimate object. The due process concerns implicated in identification of a defendant are not implicated in the identification of a vehicle.

14.

Identification of an accused tends to be direct proof of the case against him, while that of an inanimate object is only indirect proof of the defendant's guilt.

*Commonwealth v. Chmiel*, 585 Pa. 547, 587, 889 A.2d 501 (2005).

{¶ 41} The *Chmiel* court continued, "This principle is even more compelling in this instance because motor vehicles are not unique. On the other hand, there is only one person with the physical characteristics exactly like those of the defendant." *Id.*

{¶ 42} Similarly, the New Jersey Supreme Court has held that pretrial identification of objects are not subject to constitutional protections stating: "[W]e reject defendant's invitation to extend to inanimate objects, such as cars, the carefully crafted due process protections applicable to identification procedures of persons." *State v. Delgado*, 188 N.J. 48, 66, 902 A.2d 888 (2006). *Delgado* cites additional cases which reject appellant's argument including: *Inge v. Procunier*, 758 F.2d 1010, 1015 (4th Cir.1985); *Hughes v. State*, 735 So.2d 238, 261 (Miss.1999); *State v. Cyr*, 453 A.2d 1315, 1317 (N.H.1982). *Id.* at 66-67.

{¶ 43} On the other hand, the Massachusetts Supreme Court noted the possibility of an exception for a rare and extreme case of potential prejudice stemming from an inanimate-object identification. *Commonwealth v. Simmons*, 383 Mass. 46, 417 N.E.2d 1193 (1981). In *Simmons*, the issue focused on the identity of a blue Ford Mustang alleged to be driven by the defendant when he picked up the hitchhiking victim and stabbed and raped her. Nine days before trial, the car at issue was parked in a private

15.

yard and the victim, accompanied by police, looked into its windows to identify the specific elements of the vehicle's dashboard and radio that she recalled seeing during the attack. Defense counsel was informed of the identification 30 minutes before trial; his subsequent request for a continuance was denied. *Id.* at 47. Notably, when questioned at the hospital shortly after the incident, the victim referred to her attacker's vehicle as a "Volkswagen-type" rather than a Mustang, and authorities were concerned about her ability to properly identify the vehicle. *Id.* at 49.

{¶ 44} On appeal, defendant alleged error due to the victim's varied recollection of the vehicle and alleged prejudice with the in-person show up process used to identify it. The *Simmons* court recognized the difference between an out-of-court identification of a defendant and an out-of-court identification of an inanimate object and the chance of fundamental unfairness being greater in the former situation. *Id.* at 52. It further recognized that most tangible objects are not unique, irrespective of a distinct appearance. However, the court noted:

> [We] recognize that, in an extreme case, the degree of suggestiveness of an identification procedure concerning an inanimate object might rise to the level of a denial of due process. Even if constitutional considerations did not apply, an appropriate rule of evidence might require that an identification of an inanimate object not be admitted in evidence where the government used a highly suggestive identification

procedure because the unfair, prejudicial, and unreliable quality of the identification would outweigh its probative value.

*Id.* at 51-52.

{¶ 45} The *Simmons* court ultimately concluded that the circumstances surrounding the vehicle's identification were before the jury whose role is was to assess the weight it was to be given. *Id.* at 52. However, the matter was remanded for a hearing on the constitutionality of the warrantless search of the vehicle. *Id.* at 55.

{¶ 46} Here, appellant contends unfairness because the truck was only described by the witness as blue, with no mention of the multicolored body panels. He further contends that the photo array depicted no other vehicles with a different colored fender like his. However, unlike the *Simmons'* theoretical "rare exception," there is no evidence to indicate that the detectives did or said anything suggestive to T.J. prior to or while being shown the photo array. The record is devoid of evidence that appellant's truck was identified because of its colorful appearance or that detectives lead the witness to believe the colorful truck belonged to appellant. While appellant argues that the victim's referral to the truck as "Mr. Leu's truck" evidences suggestiveness by the detectives during the investigation, there is no evidence inferring as much. The jury's role was to assess the credibility of the evidence surrounding the administration of the photo array. Appellant's second assignment of error is not well-taken.

{¶ 47} In his third assignment of error, appellant argues that he was denied the effective assistance of trial counsel by counsel's failure to file a motion to suppress the

17.

pretrial identification of his pickup truck. To establish ineffective assistance of counsel, a defendant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 48, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.E.2d 674 (1984). To succeed, a defendant must overcome the strong presumption that counsel's conduct fell within the "wide range of reasonable professional assistance." *Strickland* at 689. The failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel. *See State v. Hernandez*, 6th Dist. Lucas Nos. L-06-1388, L-06-1389, 2009-Ohio-386, ¶ 83. Further, "'[f]ailure to file a motion to suppress constitutes ineffective assistance of counsel only if, based upon the record, the motion would have been granted.'" *Id.*, quoting *State v. Kuhn*, 9th Dist. Lorain No. 05CA008859, 2006-Ohio-4416, ¶ 11. Thus, where the filing of a motion to suppress would be a "futile act" counsel is presumed to be effective. *State v. Conkright*, 6th Dist. Lucas No. L-06-1107, 2007-Ohio-5315, ¶ 50.

{¶ 48} Based upon our disposition of appellant's second assignment of error, we find that had appellant's counsel filed a motion to suppress the identification of the pickup truck it would not have been successful. Appellant's third assignment of error is not well-taken.

18.

{¶ 49} Appellant's fourth assignment of error asserts that his convictions are not supported by sufficient evidence and are against the weight of the evidence. Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Sufficiency of the evidence is purely a question of law. *Id.* Under this standard of adequacy, a court must consider whether the evidence was sufficient to support the conviction as a matter of law. *Id.* The proper analysis is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 50} Conversely, a claim that a jury verdict is against the manifest weight of the evidence requires an appellate court to act as a "thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. An appellate court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

19.

*Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 51}** Appellant was convicted of attempted murder and felonious assault which required the state to prove that appellant purposely attempted to cause the death of the victim, R.C. 2903.02(A) and 2923.02, and that he knowingly caused or attempted to cause physical harm to the victim, R.C. 2903.11(A)(2). Appellant was also convicted of obstructing justice, R.C. 2921.32, which prohibits a person from purposely providing false information to any person "with the purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime * * *."

**{¶ 52}** Construing the evidence most favorably to the prosecution, in our view a rational trier of fact could have found beyond a reasonable doubt that appellant knowingly caused or attempted to cause death or physical harm to T.J. A rational trier of fact could have also found beyond a reasonable doubt that appellant obstructed justice.

**{¶ 53}** We further find that the convictions were not against the weight of the evidence. Appellant's argument focuses on the evidence surrounding the identification of appellant as the shooter and a motive for the crimes. Appellant apparently believes that his version of the events: that Jennifer's husband shot T.J. in a jealous rage was more plausible than appellant shooting T.J. following the altercation at the bar.

**{¶ 54}** In our view, the evidence did not weigh heavily against conviction and the jury acted reasonably in rendering a guilty verdict. Evidence was presented at trial identifying appellant's truck as the vehicle driven during the shooting, the victim identified appellant as the shooter, and the shooting took place in close proximity, both

20.

time and distance-wise to the location of the altercation. Any resolution in conflicting evidence regarding the victim's ability to identify the truck or driver and the neighbor's identification of appellant and his truck was left to the jury. We cannot say that the jury lost its way in resolving any conflicts.

{¶ 55} Based on the foregoing, we conclude that the appellant's convictions for attempted murder, felonious assault, and obstructing justice were supported by sufficient evidence and were not against the manifest weight of the evidence. Accordingly, we find that appellant's fourth assignment of error is not well-taken.

{¶ 56} Appellant's fifth and final assignment of error alleges prejudice based on cumulative error. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. However, where, as here, there are not multiple instances of harmless error, the cumulative error doctrine does not apply. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Accordingly, appellant's fifth assignment of error is not well-taken.

{¶ 57} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial. The judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.     _____
                   JUDGE

Christine E. Mayle, P.J.

Gene A. Zmuda, J.      _____
CONCUR.                 JUDGE


                 _____
                   JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.