[Cite as *State v. Peterson*, 2023-Ohio-3544.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                       Court of Appeals No.  WD-22-061

    Appellee                                      Trial Court No.  2020CR0364

v.

Cortez Peterson                               **DECISION AND JUDGMENT**

    Appellant                                     Decided:  September 29, 2023

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Cortez Peterson, appeals the judgment of the Wood County Court

of Common Pleas, following a jury trial, convicting him of both trafficking in, and

possession of, a fentanyl-related compound with a major drug offender specification.  For

the following reasons, we affirm the trial court's judgment.

# I. Background

{¶ 2} On August 11, 2020, Ohio State Highway Patrol Trooper Garrett Lawson conducted a traffic stop of Peterson as he was traveling southbound on Interstate 75 near Bowling Green in Wood County, Ohio. The circumstances of the stop led to a search of the vehicle, which uncovered two plastic bags containing a combined weight of over 100 grams of fentanyl and acetyl fentanyl.

{¶ 3} On October 22, 2020, the Wood County Grand Jury indicted Peterson on one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2) and (C)(9)(h) with a major drug offender specification under R.C. 2941.1410(B), a felony of the first degree; one count of possession of a fentanyl-related compound in violation of R.C. 2925.11(A) and (C)(11)(g) with a major drug offender specification under R.C. 2941.1410(A), a felony of the first degree; and two counts of resisting arrest in violation of R.C. 2921.33(B) and (D), misdemeanors of the first degree.

{¶ 4} Peterson entered an initial plea of not guilty and the matter proceeded to a pretrial on April 16, 2021. Peterson failed to appear for the pretrial and a warrant was issued for his arrest. Near the end of September 2021, Peterson was apprehended and his bond was revoked.

{¶ 5} On October 21, 2021, Peterson moved to suppress the evidence resulting from the traffic stop. In his motion, Peterson argued that Trooper Lawson lacked a reasonable, articulable suspicion that he violated the law; thus, the traffic stop was unjustified. Lawson had identified that Peterson violated R.C. 4511.33(A)(1), which

2.

provides that "A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." However, Peterson argued that the dash camera video showed no such violation, but rather showed Peterson making a lane change, at a reasonable rate, from the left-hand lane into the middle lane, and again from the middle lane into the right-hand lane, and then into the exit lane. Peterson also alleged that the video showed adequate space existed between his vehicle and the vehicles around him. He concluded that "no prudent or reasonable officer would believe that a violation had occurred under the circumstances."[1]

{¶ 6} The trial court held a hearing on Peterson's suppression motion on April 6, 2022. At the hearing, Trooper Lawson testified that on August 11, 2020, at approximately 11:00 a.m., he was stationed in the center median observing southbound traffic on Interstate 75 near mile marker 185 when he saw a white minivan approaching in the left lane. The minivan had California license plates, no license plate bracket, was clean, and did not look "traveled." Peterson was the only occupant of the vehicle and Lawson observed that he was sitting straight up in his seat in a rigid position with his left

---

[1] Peterson's suppression motion also argued that the subsequent warrantless search of the vehicle was unconstitutional. The trial court ruled that Peterson lacked standing to object to the search because he abandoned the vehicle when he fled on foot from the officers and ran across four lanes of traffic. Peterson does not challenge the trial court's ruling on the constitutionality of the search of the vehicle on appeal. Thus, this decision will not focus on that aspect of his motion to suppress.

3.

arm locked out at the ten o'clock position on the steering wheel. Peterson was staring straight ahead and had a worried look on his face. Lawson checked the speed of the minivan and it was travelling 72 m.p.h. in a 70 m.p.h. zone. He stated he was curious why Peterson would have an "oh shoot" moment since there was no excessive speed violation.

{¶ 7} Given the circumstances, Lawson suspected that the minivan was a rental vehicle coming from the Michigan area. He testified, "What I normally see on 75 is -- when it pertains to drug trafficking -- a clean vehicle southbound is usually coming out of Detroit. That's just -- I initiate hundreds of cases on 75, usually around a hundred a year, and about a third to 40 percent of those are felony drug cases."

{¶ 8} He then pulled into traffic and began catching up to Peterson's vehicle. As he was approaching, Lawson observed Peterson make an abrupt lane change from the left lane to the middle lane in between two vehicles, which caused the rear vehicle "to slam on his brakes." Lawson noted that there was no reason for the lane changed based on the traffic flow. He testified that the abrupt lane change without assuring adequate space between the vehicles violated R.C. 4511.33.

{¶ 9} Lawson testified that a second violation occurred as Peterson took the exit from southbound Interstate 75 onto Wooster St. According to Lawson, Peterson activated his turn signal contemporaneously with his movement into the exit lane. Under R.C. 4511.39, the turn signal must be given not less than 100 feet before the turn. A third

4.

violation occurred when Peterson failed to maintain a safe distance between himself and the car in front of him on the exit ramp.

{¶ 10} As Peterson was on the exit ramp, Lawson turned on his overhead lights and initiated a traffic stop. Peterson complied and pulled the minivan into an abandoned gas station. Lawson testified that he approached the passenger's side of the minivan and noticed an air freshener hanging in the rear passenger area, which he explained he often sees when the driver is trying to mask an odor, typically marijuana. Peterson rolled the front passenger window down about a third of the way, which Lawson stated was another way that drivers will try to mask an odor. Nonetheless, Lawson detected a strong odor of burnt marijuana coming from the vehicle. Upon inquiry, Peterson stated that he did not have his driver's license, did not know his social security number, and was unable to provide his birthdate. In Lawson's experience that indicated that Peterson was trying to hide his identity. Additionally, Peterson stated that his girlfriend rented the minivan, which Lawson testified was typical in a drug trafficking situation.

{¶ 11} Lawson asked Peterson to step out of the vehicle and initially Peterson refused but he ultimately complied. Lawson then escorted Peterson to the back of his patrol cruiser so that he could ascertain Peterson's identity. Peterson asked if he had to get into the back seat and Lawson said "Yes." At that point, Peterson pulled away from Lawson and fled on foot across the road and four lanes of traffic. One of the other responding officers deployed his taser and eventually Peterson was subdued.

5.

{¶ 12} Thereafter, the vehicle was searched and Lawson discovered two bags, one containing a brown, rock powder and the other containing a white, rock powder. The substances were later determined to be fentanyl and acetyl fentanyl.

{¶ 13} On cross-examination, Lawson testified that he would not normally initiate a traffic stop for a vehicle travelling 72 m.p.h. in a 70 m.p.h. zone. Lawson also was asked if he determined Peterson's race as the minivan was passing by him. Lawson responded, "So I have learned in today's age to not assume anybody's race or ethnicity, so I'd rather not. He was darker than I was. I don't want to assume his race or his ethnicity. I don't know his background."

{¶ 14} Following the hearing, and with the permission of the court, the state filed its opposition to Peterson's motion to suppress. The state argued that Trooper Lawson's testimony established at least a reasonable suspicion, if not probable cause, to believe that Peterson violated R.C. 4511.39 when he abruptly changed lanes into the middle lane, causing the vehicle behind him to slam on its brakes. Further, Peterson violated R.C. 4511.39 when he failed to use his turn signal 100 feet or more prior to moving onto the exit ramp.

{¶ 15} Peterson, in reply, argued that driving 72 m.p.h. in a 70 m.p.h. zone and "simply changing lanes" was not indicative of criminal activity. Further, based upon the dashcam video, Peterson argued that there was ample space between his vehicle and the vehicle behind him such that the other vehicle did not need to apply its brakes.

6.

{¶ 16} On June 6, 2022, the trial court entered its judgment denying Peterson's motion to suppress. Relevant here, the trial court reasoned that a de minimis violation of traffic laws is generally sufficient to justify a stop. The court found that Lawson's testimony and the dash camera video established that Peterson "failed to assure clear distance in changing lanes, failed to use his turn signal appropriately, and generally drove erratically causing the vehicle behind him to take evasive action." Therefore, the court held that Lawson's observance of Peterson's traffic violations justified the initial stop.

{¶ 17} Shortly after the suppression motion was filed, and while it was pending, Peterson began to experience breakdowns with his defense counsel. On October 22, 2021, Peterson requested to terminate his representation by his first defense counsel, Sara Roller. The trial court granted Peterson's request and appointed his second defense counsel, Steven Spitler. On January 10, 2022, Spitler moved to withdraw as defense counsel citing a breakdown in the attorney-client relationship. The trial court granted Spitler's motion to withdraw and appointed Peterson's third defense counsel, T. Hamilton Noll, on February 8, 2022. The record is unclear what happened next, but on March 4, 2022, the trial court appointed Peterson's fourth defense counsel, Esteban Callejas. Callejas represented Peterson at the suppression hearing.

{¶ 18} On May 24, 2022, less than one month before the jury trial was set to begin, Peterson filed a motion for funds to hire a private investigator. The trial court held a hearing on this motion on June 16, 2022. At the hearing, Peterson argued that the investigator was needed to find the individual who rented the minivan, to find the

7.

individual who he was traveling into Bowling Green to see, and to find information about a third individual who he claims he traveled into Toledo with, but who is now dead. The trial court denied Peterson's motion, reasoning that Peterson knew the name of the first individual and he could call that person as a witness. The court also was not convinced that an investigator would help with Peterson's defense. Finally, the trial court recognized that Peterson has taken multiple steps to delay the trial and "at some point in time, I mean, the case has got to be tried."

{¶ 19} On June 22, 2022, the matter was called for trial. At the outset of the proceedings, Peterson orally requested that his defense counsel be dismissed and that he be allowed to proceed representing himself. The trial court denied Peterson's request, noting that defense counsel had capably represented Peterson in the preceding months and now was well-prepared to represent Peterson at the trial. The court informed Peterson that he could revive his motion to represent himself at any point throughout the trial.

{¶ 20} Peterson then withdrew his initial plea of not guilty to the two misdemeanor charges of resisting arrest and pleaded no contest. The trial court engaged in a colloquy with Peterson, accepted his pleas of no contest, and found him guilty.

{¶ 21} Thereafter, jury selection began on the remaining charges of drug trafficking and possession. A jury was not empaneled, however, because there were too few jurors remaining after the for-cause and peremptory challenges. Thus, the trial was continued and rescheduled for August 15, 2022.

8.

**{¶ 22}** At the rescheduled trial, Trooper Lawson testified similarly to the testimony in the suppression hearing about the events of Peterson's arrest and the discovery of the drugs. The state also presented the testimony of a lab analyst, who testified that the drugs contained fentanyl and acetyl fentanyl and that the combined weight of the drugs exceeded 100 grams. Finally, the state presented the testimony of the person who conducted the search of Peterson's phone, which did not reveal any particularly relevant information.

**{¶ 23}** Peterson also testified at the trial, and offered his explanation that he was riding as a passenger with his friend Bernard to Toledo, Ohio, to act as a cover while Bernard cheated on his girlfriend with another woman. According to Peterson, Bernard's girlfriend, Miranda, was the person who rented the white minivan that Peterson was driving. While Bernard was with the other woman, Peterson saw on a social media marketplace that a person had a sound board for sale in Bowling Green, Ohio. Although he did not have any intention to purchase the sound board at the time, Peterson drove from Toledo to Bowling Green to inquire about and examine the sound board, during which trip he was stopped by Trooper Lawson. Peterson claimed that he did not know that there were drugs in the minivan.

**{¶ 24}** The jury found Peterson guilty of both trafficking and possession. At sentencing, the trial court merged the counts of trafficking and possession, and the state elected to proceed on the count of trafficking. On that count, the court ordered Peterson to serve an indefinite term of 15 to 20 1/2 years in prison. The trial court also ordered

9.

Peterson to serve 180 days on each of the counts of resisting arrest that Peterson had previously pleaded guilty to, and ordered those sentences to be served concurrently with his prison term for trafficking.

{¶ 25} Peterson has timely appealed his judgment of conviction and now asserts four assignments of error for our review:

> 1. The trial court erred in denying the motion to suppress evidence obtained as a result of a seizure which violated the Ohio and United States Constitutions.

> 2. Mr. Peterson plainly and clearly requested to represent himself in this case and is able to point to a specific strategic decision - the refusal to call witness - that would have occurred differently, as such the trial court erred in denying Mr. Peterson self-representation, in denial of his rights under the Ohio and United States Constitutions.

> 3. The trial court erred in not granting funds for an investigator, and for not conducting an *ex parte* hearing on the matter.

> 4. Cumulative error.

## II. Law and Analysis

## A. Motion to Suppress

{¶ 26} In his first assignment of error, Peterson argues that the trial court erred when it denied his motion to suppress.

**{¶ 27}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court acts as the trier of fact at a suppression hearing by weighing the evidence and determining the credibility of the witnesses. Although we must accept any findings of fact that are supported by competent, credible evidence, we conduct a de novo review to determine whether the facts satisfy the applicable legal standard, and this independent review is done without deference to the trial court. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *Burnside* at ¶ 8; *State v. Jones-Bateman*, 6th Dist. Wood Nos. WD-11-074, WD-11-075, 2013-Ohio-4739, ¶ 9.

**{¶ 28}** The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide protection against unreasonable searches and seizures. This includes automobile stops. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[A] traffic stop is constitutionally reasonable when the officer making the stop has probable cause to believe that a traffic violation has occurred." *Toledo v. Reese*, 2018-Ohio-2981, 112 N.E.3d 514, ¶ 17 (6th Dist.), citing *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, 850 N.E.2d 698, ¶ 11; *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), syllabus. "Probable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense." *Id.*, quoting *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26.

11.

{¶ 29} Relevant here, R.C. 4511.33(A)(1) provides that "A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." In addition, R.C. 4511.39(A) provides,

> No person shall turn a vehicle or trackless trolley or move right or left upon a highway unless and until such person has exercised due care to ascertain that the movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.

> When required, a signal of intention to turn or move right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle or trackless trolley before turning * * *.

{¶ 30} At the suppression hearing, Lawson testified that he observed Peterson merge into the center lane in front of another vehicle, causing that vehicle to "slam on his brakes." Lawson also testified that he observed Peterson travel into the exit lane of the highway without signaling 100 feet before his lane change. Lawson's testimony constitutes competent, credible evidence supporting the trial court's finding that Peterson "failed to assure clear distance in changing lanes, failed to use his turn signal appropriately, and generally drove erratically causing the vehicle behind him to take evasive action." Those findings support the trial court's conclusion that Lawson had probable cause to believe that Peterson committed a traffic offense and thus the traffic

12.

stop was constitutionally reasonable. Therefore, we hold that the trial court did not err when it denied Peterson's motion to suppress.

{¶ 31} Rather than strenuously contesting the reasonableness of the traffic stop under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution, Peterson spends much of his time on appeal arguing that the stop was unconstitutional under the federal and state equal protection clauses in that Lawson was engaged in profiling. Peterson further argues that suppression of the evidence is an appropriate remedy for the violation of his equal protection rights. Peterson, however, did not raise this theory in the trial court. "Generally, appellate courts will not consider errors which could have been, but were not, called to the attention of the trial court * * * including constitutional issues raised for the first time on appeal." *State v. Wesley*, 149 Ohio App.3d 453, 2002-Ohio-5192, 777 N.E.2d 905, ¶ 5 (6th Dist.), citing *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986); *State v. Henning*, 6th Dist. Wood No. WD-22-046, 2023-Ohio-2905, ¶ 27 ("A party may not change [his] theory of the case and present new arguments for the first time on appeal. * * * Arguments raised for the first time on appeal will not be considered by an appellate court."). Therefore, we decline to review Peterson's equal protection arguments.

{¶ 32} Accordingly, Peterson's first assignment of error is not well-taken.

### B. Right to Self-Representation

{¶ 33} In his second assignment of error, Peterson argues that the trial court erred when it denied his request to represent himself.

13.

{¶ 34} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee to a criminal defendant the right to counsel. Implicit within those provisions is "a correlative right to dispense with a lawyer's help." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 26, quoting *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 23; *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). "[A] defendant in a state criminal trial has an independent constitutional right of self-representation and * * * he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *Id.* at ¶ 28, quoting *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus. But, "even if a defendant has made an unequivocal and explicit request for self-representation, a defendant may later waive that request by acquiescing in counsel's representation." *Id.* at ¶ 31, citing *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 42. "[W]here 'the record definitively demonstrates [that] a defendant abandoned his request to represent himself * * * there is no violation of the Sixth Amendment right to self-representation.'" *State v. Terrell*, 6th Dist. Ottawa No. OT-22-013, 2022-Ohio-4312, ¶ 30, quoting *State v. Cook*, 5th Dist. Stark No. 2015CA00090, 2016-Ohio-2823, ¶ 92.

{¶ 35} Assuming for purposes of this analysis that Peterson made a voluntary, knowing, and intelligent request to proceed without counsel at the beginning of his first scheduled trial in June 2022, the record definitively demonstrates that he abandoned his

14.

request to represent himself at the trial eventually conducted in August 2022. At the time the trial court denied his initial request in June 2022, the court informed Peterson that he could revive his motion at any point throughout the trial. When the trial was ultimately held two months later, Peterson made no attempt to assert his right to self-representation. He proceeded through the trial with counsel, having discussions with counsel and assisting in his defense. Therefore, the record shows that Peterson abandoned his request to represent himself and acquiesced in counsel's representation.

{¶ 36} Accordingly, Peterson's second assignment of error is not well-taken.

### C. Funds for an Investigator

{¶ 37} In his third assignment of error, Peterson argues that the trial court erred when it denied his request for funds for a private investigator.

{¶ 38} "As a matter of due process, indigent defendants are entitled to receive the 'raw materials' and the 'basic tools of an adequate defense,' * * *." *State v. Mason*, 82 Ohio St.3d 144, 149, 694 N.E.2d 932 (1998), quoting *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

> Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested

expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial.

*Id.* at syllabus. Appellate courts review the denial of a motion for funds to employ an expert or court-appointed investigator for an abuse of discretion. *State v. Torres*, 174 Ohio App.3d 168, 2007-Ohio-6651, 881 N.E.2d 320, ¶ 15 (8th Dist.); *State v. Blankenship*, 102 Ohio App.3d 534, 551, 657 N.E.2d 559 (12th Dist.1995). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 39} Peterson argues that he was unable to obtain a fair trial because he was unable to find and call as witnesses the person who rented the vehicle and the person he was travelling to meet in Bowling Green. Notably, Peterson did not need an investigator to locate his friend Bernard because Bernard was deceased. Peterson contends that the matter is further complicated by the fact that his counsel did not request the funds in an ex parte manner—thereby allowing the state an opportunity to respond—and by the fact that his previous counsel had access to an investigator through the public defender's office.

{¶ 40} At the outset, Peterson's argument that the trial court should have evaluated his request in light of his prior access to an investigator through the public defender's office is unavailing. Overlooking the fact that Peterson fired his public defender, due process entitles Peterson to an investigator if he can make a particularized showing of need as outlined in *Mason*. Peterson failed to make that showing. First, as noted by the

16.

trial court, Peterson knew the identity of the person who rented the minivan and had access to the rental agreement with her name on it. He could have called her as a witness. Second, even if an investigator could have uncovered the person in Bowling Green that was selling a sound board two years earlier, there is no reasonable indication that the person would have any information pertaining to Peterson's ownership of the minivan or his knowledge of the presence of drugs inside of it. Thus, we agree with the trial court that it is difficult to see how an investigator would have helped with Peterson's defense. Finally, the fact that counsel did not make the request ex parte is immaterial; the defect in Peterson's request was that he could not make a particularized showing of need. Therefore, the trial court's denial of Peterson's request for funds to hire an investigator was not an abuse of discretion.

{¶ 41} Accordingly, Peterson's third assignment of error is not well-taken.

### D. Cumulative Error

{¶ 42} Finally, in his fourth assignment of error, Peterson argues that his conviction should be reversed because of cumulative error.

{¶ 43} Under the doctrine of cumulative error, a conviction will be reversed where "the cumulative effect of trial-court errors deprives a defendant of a fair trial even though each instance of error does not individually constitute cause for reversal." *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 174; *State v. Leu*, 2019-Ohio-3404, 142 N.E.3d 164, ¶ 56 (6th Dist.). "However, where, as here, there are

17.

not multiple instances of harmless error, the cumulative error doctrine does not apply." *Leu* at ¶ 56; *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000).

**{¶ 44}** In this case, because we have not found any errors, the cumulative error doctrine does not apply. Peterson's fourth assignment of error is not well-taken.

### III. Conclusion

**{¶ 45}** The trial court did not err in denying Peterson's motion to suppress where the traffic stop was reasonable as supported by Lawson's testimony establishing probable cause to believe that Peterson committed a traffic violation. Further, the trial court did not violate Peterson's right to self-representation where the record definitively demonstrates that Peterson abandoned his request and acquiesced in the participation of counsel. Finally, the trial court did not violate Peterson's right to due process when it denied him funds for an investigator where Peterson failed to demonstrate a particularized need.

**{¶ 46}** In light of the foregoing, the judgment of the Wood County Court of Common Pleas is affirmed. Peterson is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.      _____
                                          JUDGE

Gene A. Zmuda, J.

                                        _____
Charles E. Sulek, J.                                 JUDGE
CONCUR.

                                        _____
                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.