[Cite as *State v. Thompson*, 2021-Ohio-2979.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 9-20-35

    v.

JERMAIL N. THOMPSON,             O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Marion County Common Pleas Court
Trial Court No. 2019 CR 0115

Judgment Affirmed

Date of Decision: August 30, 2021


APPEARANCES:

    *Thomas A. Gjostein* **for Appellant**

    *Nathan R. Heiser* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Jermail N. Thompson, appeals the September 15, 2020 judgment of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

## I.     Facts and Procedural History

{¶2} On October 25, 2018, Logan Good was found in his bedroom dead from an apparent drug overdose. During a search of Good's bedroom, law enforcement officers located Good's wallet. Officers searched the wallet, where they discovered a baggie containing a "tannish/peach" substance. Good's cell phone was also located during the search of his bedroom. Law enforcement officers accessed Good's cell phone and examined the text message history. Of particular note was a series of text messages between Good and Thompson from the early morning hours of October 25, 2018, in which Good and Thompson appeared to talk about an exchange of drugs and money. Relying on these text messages, law enforcement officers obtained a warrant to search Thompson's residence. During a search of Thompson's bedroom, officers located a baggie that, like the baggie found in Good's wallet, contained a "tannish/peach" substance. Subsequent testing revealed the substance found in Good's wallet and the substance found in Thompson's bedroom both contained fentanyl. An autopsy later determined Good died from an overdose of fentanyl.

{¶3} On April 4, 2019, the Marion County Grand Jury indicted Thompson on two counts: Count One of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony, and Count Two of aggravated possession of drugs in violation of R.C. 2925.11(A), a fifth-degree felony. On April 8, 2019, Thompson appeared for arraignment and pleaded not guilty to the counts in the indictment.

{¶4} On September 18, 2019, the Marion County Grand Jury issued a three-count superseding indictment. Counts One and Two of the original indictment were preserved, and Thompson was additionally charged with Count Three of corrupting another with drugs in violation of R.C. 2925.02(A)(3), a second-degree felony. On September 23, 2019, Thompson appeared for arraignment and pleaded not guilty to the counts in the superseding indictment.

{¶5} A jury trial was held on July 14-17, 2020. On July 17, 2020, the jury found Thompson guilty as charged in the superseding indictment.

{¶6} Thompson's sentencing hearing was held on September 14, 2020. At the hearing, the trial court determined that Count One, involuntary manslaughter, and Count Two, aggravated possession of drugs, would merge for purposes of sentencing. The State elected to have the trial court sentence Thompson for the involuntary-manslaughter offense. It was further determined that Count Three, corrupting another with drugs, would not merge with the other offenses for purposes of sentencing. Thereafter, the trial court sentenced Thompson to a term of eight

years in prison for involuntary manslaughter and a mandatory term of eight years in prison for corrupting another with drugs. The trial court ordered Thompson to serve these terms concurrently. The trial court filed its judgment entry of sentence on September 15, 2020.

{¶7} On October 1, 2020, Thompson timely filed a notice of appeal. He raises two assignments of error for our review.

## II. Assignments of Error

**1.  The appellant had his rights to due process of law violated under Article 1, Section 10 of the Ohio Constitution and the Sixth Amendment of the United States Constitution, in being compelled to stand trial when trial counsel was rendered ineffective for failing to file a motion to suppress the search of appellant's residence and to suppress or exclude by motion in limine his statements, as well as, for having the appellant testify given the State's complete lack of evidence against him. [Tr. Vol. I. 214].**

**2.  Appellant's conviction was not supported by the sufficiency of the evidence in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Sections 1 & 16 of the Ohio Constitution and the conviction was also against the manifest weight of the evidence. [Tr. Overall].**

## III.  Discussion

**A.  First Assignment of Error:  Did Thompson receive ineffective assistance of counsel?**

{¶8} In his first assignment of error, Thompson argues he was denied his right to the effective assistance of counsel as provided for by the United States Constitution and by the Ohio Constitution. Thompson contends his trial counsel

was ineffective in five respects: (1) Thompson's trial counsel was ineffective for failing to file a motion to suppress the evidence seized during the search of Thompson's home; (2) Thompson's trial counsel was ineffective for failing to file a motion to suppress recordings of statements Thompson made to law enforcement officers during interviews on October 25 and October 29, 2018; (3) Thompson's trial counsel was ineffective for failing to file a motion in limine to bar introduction of these same recordings at trial; (4) Thompson's trial counsel was ineffective for calling Thompson and another person, Nicole Cooper, as witnesses; and (5) Thompson's trial counsel was ineffective for conceding during closing statements that Thompson committed the offense of aggravated possession of drugs.

**i. Ineffective-Assistance-of-Counsel Standard**

{¶9} "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent

representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶10} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**ii. Motion to Suppress Evidence Seized Pursuant to the Search Warrant**

{¶11} Thompson first argues his trial counsel was ineffective for failing to file a motion to suppress the evidence seized during the search of his residence. Thompson maintains the warrant authorizing the search of his home was invalid because it was based on an affidavit that contained "very thin evidence."

{¶12} However, we are unable to consider this facet of Thompson's ineffective-assistance argument because the supposedly deficient search-warrant

affidavit is not part of the record on appeal. "A claim of ineffective assistance of counsel in a direct appeal must be established by the evidence in the record." *State v. Carter*, 7th Dist. Mahoning No. 15 MA 0225, 2017-Ohio-7501, ¶ 78. "When an allegation of ineffective assistance of counsel is based upon material that is not part of the record, the merits of the argument cannot be addressed." *State v. Barnett*, 7th Dist. Jefferson No. 06-JE-23, 2008-Ohio-1546, ¶ 130. Without the search-warrant affidavit, we are unable to determine whether it set forth sufficient facts to support a finding of probable cause to search Thompson's residence. Consequently, we are unable to determine whether Thompson's trial counsel performed deficiently by failing to pursue a meritorious suppression motion, and we must presume regularity in the proceedings below with respect to the evidence seized from Thompson's house. *State v. Ash*, 7th Dist. Monroe No. 16 MO 0002, 2018-Ohio-1139, ¶ 30-31; *see State v. Davidson*, 11th Dist. Portage No. 2005-P-0038, 2006-Ohio-1458, ¶ 31 (declining to consider a claim that trial counsel was ineffective for failing to file suppression motion based on defects in search-warrant affidavit, where affidavit was not made part of the record); *State v. Castile*, 6th Dist. Erie No. E-02-012, 2005-Ohio-41, ¶ 60 (same).

### iii. Motion to Suppress Recordings and Motion in Limine

{¶13} Thompson next argues his trial counsel was ineffective for failing to file a motion to suppress the recordings of interviews he gave to law enforcement

officers on October 25 and October 29, 2018. Specifically, Thompson maintains that his trial counsel should have moved to suppress these recordings because law enforcement officers did not administer the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, prior to conducting the interviews. Thompson also contends his trial counsel should have at least filed a motion in limine to exclude the recordings from trial because the recordings were unfairly prejudicial.

{¶14} "The failure to file a motion is not per se ineffective assistance of counsel." *State v. Costell*, 3d Dist. Union No. 14-15-11, 2016-Ohio-3386, ¶ 161. To sustain a claim of ineffective assistance of counsel based on counsel's failure to file a particular motion, the defendant must first specify the basis for the motion that counsel supposedly should have filed. *See State v. Phelps*, 5th Dist. Delaware Nos. 18 CAA 02 0016 and 18 CAA 02 0017, 2018-Ohio-4738, ¶ 13. Then, the "'defendant must show that the motion had a reasonable probability of success.'" *State v. Dahms*, 3d Dist. Seneca No. 13-16-16, 2017-Ohio-4221, ¶ 101, quoting *State v. Ferguson*, 10th Dist. Franklin No. 16AP-307, 2016-Ohio-8537, ¶ 11; *Phelps* at ¶ 13. If the defendant fails to demonstrate that there is a reasonable probability that the proposed motion would have been granted, counsel is presumed to have been effective since the filing of the motion would have been a "futile act," which the law does not require counsel to undertake. *State v. Leu*, 6th Dist. Lucas No. L-17-1265, 2019-Ohio-3404, ¶ 47; *State v. Cottrell*, 4th Dist. Ross Nos. 11CA3241

and 11CA3242, 2012-Ohio-4583, ¶ 20. Additionally, even if the defendant succeeds in establishing a reasonable probability of success on the proposed motion, he still "must further show that there is a reasonable probability that the outcome [of the trial] would have been different if the motion had been granted * * *." *State v. Blanton*, 4th Dist. Adams Nos. 19CA1096 and 19CA1097, 2020-Ohio-7018, ¶ 50, *appeal allowed*, 162 Ohio St.3d 1444, 2021-Ohio-1398; *Phelps* at ¶ 13.

**a. Motion to Suppress Based on Lack of *Miranda* Warnings**

{¶15} The first motion Thompson claims his trial counsel should have filed is a motion to suppress the recordings of his October 25 and October 29, 2018 interviews with law enforcement officers. Thompson maintains that, if his trial counsel had properly filed a motion to suppress, these recordings would have been subject to suppression because he was not given *Miranda* warnings prior to participating in the interviews. Thus, to ascertain whether Thompson's trial counsel was ineffective for failing to file a motion to suppress the recordings, we must first determine whether Thompson has demonstrated a sufficient likelihood of success on his proposed suppression motion.

{¶16} "Police officers are not required to administer *Miranda* warnings to every person whom they question." *In re A.M.*, 3d Dist. Marion No. 9-20-23, 2021-Ohio-432, ¶ 28. "Only *custodial* interrogation triggers the need for *Miranda* warnings." (Emphasis sic.) *State v. Biros*, 78 Ohio St.3d 426, 440 (1997).

"'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-509, 132 S.Ct. 1181 (2012). "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27. "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a '"formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Id.*, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711 (1977).

{¶17} "In resolving 'the ultimate inquiry' courts must consider the totality of the circumstances surrounding the questioning." *In re R.S.*, 3d Dist. Paulding No. 11-13-10, 2014-Ohio-3543, ¶ 17. In determining whether a reasonable person in the interviewee's position would have felt free to terminate the interview and leave, the following factors are relevant: (1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) whether

the interviewee was released at the end of the questioning. *Howes* at 509. Courts have also considered factors such as whether the interviewee had access to a cell phone during the interview, "whether an officer [was] armed and display[ed] [a] weapon in a threatening fashion," and whether the interviewee went voluntarily to the police station for the interview. *State v. Soto*, 9th Dist. Lorain No. 16CA011024, 2017-Ohio-4348, ¶ 11. Because this part of Thompson's ineffective-assistance-of-counsel claim can be fully disposed of by resolving the "ultimate inquiry," we focus on determining whether Thompson was in custody during the October 25 and October 29, 2018 interviews.

{¶18} We start with the interview Thompson gave to law enforcement officers on October 25, 2018, a few hours after Good's body was discovered. The recording of the October 25, 2018 interview contains only audio, but from our review of the recording and the testimony at trial, we discern the interview was conducted in a hallway near the kitchen of Buffalo Wild Wings, the restaurant where Thompson was working.

{¶19} In the recording, which is approximately 12 minutes long, the interviewing officers inform Thompson of Good's death and ask Thompson a number of non-accusatory and largely open-ended questions. In response to these questions, Thompson makes several incriminating remarks. Most significantly, Thompson states that, earlier in the day, he had been in possession of a substance

he believed to be drugs and that Good might have taken the substance from him. Thompson tells the interviewing officers that Good came to his house that morning looking for cocaine, but he did not have any cocaine to give Good. Thompson states that, after Good entered the house, Good noticed a baggie in his bedroom and asked what was inside of the baggie. Thompson says that he told Good that he did not know what was inside of the baggie and that Good should not touch it. Thompson explains to the interviewing officers that he found the baggie a few days earlier and that, when he found it, he believed it contained crack cocaine, though he was not certain of its contents. Thompson says that while he did not see Good take the baggie, he noticed later in the day that the baggie was missing. Thompson opines that Good likely took the baggie with him when he left.

{¶20} As the interview draws to a close, the interviewing officers repeatedly express their appreciation for Thompson's cooperation. Thompson provides the officers with his phone number and home address and states that if they wished to talk to him again, he would be at home all day the following day. The interview concludes with the interviewing officers telling Thompson that they would "get out of his hair" so he could return to work.

{¶21} After reviewing the recording and the trial testimony relating to the October 25, 2018 interview, we conclude Thompson was not in custody during this meeting with officers. In determining whether Thompson was in custody during the

interview, we must consider the totality of the circumstances surrounding the questioning. Here, the short duration of the interview (approximately 12 minutes), the favorable location of the interview (a private spot within Thompson's place of employment versus a police-controlled environment), the nonconfrontational nature of the questioning, the absence of evidence that Thompson was placed in restraints during the interview, and Thompson's immediate return to work following the interview all militate against concluding that Thompson was in custody. We are confident a reasonable person in Thompson's position would have felt free to terminate the interview and, in Thompson's case, return to work.

{¶22} Next, we consider the interview Thompson gave to law enforcement officers on October 29, 2018. Although not clearly reflected in the recording of the October 29, 2018 interview, we learn from trial testimony that Thompson went voluntarily to the police station for the interview and that officers drove him home upon its conclusion. We also learn Thompson was not arrested until March 2019.

{¶23} Unlike the recording of Thompson's first interview, the recording of the October 29, 2018 interview contains both audio and video. In the recording, Thompson is seen entering an interview room in the basement of the Marion Police Department accompanied by plainclothes officers. Thompson is not handcuffed, and he is not restrained at any point during the interview. The interviewing officers' service weapons are never conspicuously displayed. Furthermore, at the beginning

of the interview, the officers assure Thompson he would not be going to jail that day, that he could terminate the interview at any time, and that, should he choose to end the interview, they would take him home. The interviewing officers repeat some of these assurances at various times throughout the interview.

{¶24} The interview, which lasts approximately 57 minutes, is more contentious than the October 25, 2018 interview. The interviewing officers employ a sharper, less sympathetic tone, and their questioning is more insistent and argumentative, including occasional bouts of yelling and strident accusations that Thompson is lying. However, despite the somewhat disputatious tenor of the interview, the officers' interviewing tactics fall far short of harassment or coercion.

{¶25} The October 29, 2018 interview covers much of the same ground as the October 25, 2018 interview. Thompson's answers to the interviewing officers' questions are frequently inconsistent with each other and with statements he made during the October 25, 2018 interview. Nonetheless, many of Thompson's core admissions and claims are unchanged. Thompson reiterates his claim that Good came to his house on the morning of October 25, 2018, looking for cocaine. Thompson repeats his earlier admission that he possessed some sort of substance on the morning of October 25, 2018, and he reaffirms his earlier statement that he did not know what the substance was. Thompson again states that Good inquired about the substance, that he told Good that he did not know what the substance was, and

that he told Good to stay away from the substance. Thompson persistently maintains that he did not sell or give Good any of the substance, instead insisting that Good took the substance without his knowledge or permission. Ultimately, Thompson concedes the substance that caused Good's death came from his house.

{¶26} After reviewing the recording of the October 29, 2018 interview and the trial testimony, we conclude that Thompson was not in custody during the October 29, 2018 interview. Again, we are mindful that in determining whether Thompson was in custody during the interview, we must consider the totality of the circumstances surrounding the questioning.

{¶27} It is true that, unlike the October 25, 2018 interview, the October 29, 2018 interview took place inside the decidedly police-dominated environment of a police station. However, "[t]he fact that a suspect is interviewed at a police station does not, unto itself, require officers to issue *Miranda* warnings." *State v. Brunson*, 11th Dist. Portage No. 2016-P-0004, 2016-Ohio-8519, ¶ 16. Weighed against the remaining circumstances, the location of the October 29, 2018 interview is relatively insignificant. At approximately 57 minutes, the interview was still fairly short in duration. The officers' questioning, though sterner and more antagonistic than their earlier questioning, was nevertheless devoid of abusive or threatening language and peppered with reminders that Thompson could terminate the interview at any time and go home. Thompson was not physically restrained during the interview, and he

was released at the end of the questioning. In fact, Thompson was not arrested until several months after the October 29, 2018 interview. Moreover, during the questioning, the interviewing officers did not display their weapons in a threatening fashion. Finally, and of particular importance, Thompson went voluntarily to the police station for questioning and the officers drove him home afterwards. Thus, the totality of the circumstances suggests that a reasonable person in Thompson's position would have felt at liberty to end the interview at any time and leave.

{¶28} In sum, we conclude Thompson was not in custody during either the October 25, 2018 interview or the October 29, 2018 interview. Because Thompson was not in custody during either interview, the interviews did not constitute custodial interrogations and the interviewing officers were not required to administer *Miranda* warnings prior to questioning Thompson. As a result, a motion to suppress the recordings of these interviews based on the interviewing officers' failure to administer *Miranda* warnings would not have had a reasonable probability of success. Because such a motion likely would not have succeeded, we conclude that Thompson's trial counsel did not perform deficiently by failing to file one. As a result, this component of Thompson's ineffective-assistance-of-counsel claim fails.

**b. Motion in Limine Based on Unfair Prejudice**

{¶29} The second motion that Thompson claims his trial counsel should have filed is a motion in limine. Thompson argues his trial counsel "could have made a simple motion in limine at trial to exclude the [recordings] under [Evid.R. 403] as prejudicial, because these statements would, and in fact did, prejudice [his] defense." Thompson's argument is without merit.

{¶30} Thompson maintains the recordings would have been excludable under Evid.R. 403 because they were prejudicial to his defense. However, Evid.R. 403, specifically Evid.R. 403(A), does not allow for the exclusion of evidence simply because that evidence is prejudicial to the defendant's case. Instead, Evid.R. 403(A) requires the exclusion of evidence only when "its probative value is substantially outweighed by the danger of *unfair* prejudice * * *." (Emphasis added.). As the Supreme Court of Ohio has observed,

> it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all prejudicial evidence—to do so would make reaching any result extremely difficult. Rather, only evidence that is *unfairly* prejudicial is excludable.

(Emphasis sic.) *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. In this case, the recordings were prejudicial to Thompson's defense inasmuch as they implicated Thompson in criminal activity, but "'[i]ncriminating' does not equal 'unfair prejudice' under Evid.R. 403(A)." *State v. Swiergosz*, 197 Ohio App.3d 40,

2012-Ohio-830, ¶ 26. Because Thompson has not argued, much less established, that the recordings' probative value was substantially outweighed by the danger of *unfair* prejudice, Thompson has failed to demonstrate a reasonable probability of success on the proposed motion in limine. Consequently, this component of Thompson's ineffective-assistance-of-counsel claim fails as well.

### iv. Witness Testimony

{¶31} Thompson also argues his trial counsel was ineffective for calling him and his friend, Nicole Cooper, as witnesses. Thompson's first claim is that trial counsel's decision to offer his testimony was unreasonable because "[b]y testifying, [Thompson] connected himself to the drugs and prejudiced himself confirming other points of the State's case, which were questionable as well." Second, Thompson contends his trial counsel was ineffective in calling Cooper as a witness because Cooper "confirmed that drugs were on [his] premises and in [his] bedroom." According to Thompson, this testimony was prejudicial because "[p]rior to [Cooper's] testimony, the only link [between him] and the drugs came from a search warrant" that should have been the subject of a motion to suppress.

### a. Thompson's Testimony

{¶32} We deal first with the claim that Thompson's trial counsel was ineffective for deciding to have Thompson testify at trial. At the outset, we note that while Thompson maintains that it was his trial counsel who decided to put him

on the witness stand, this is not exactly accurate. "A criminal defendant has the right to testify in his defense at trial." *State v. Ruggles*, 12th Dist. Warren Nos. CA2019-05-038, CA2019-05-044, CA2019-05-045 and CA2019-05-046, 2020-Ohio-2886, ¶ 73, citing *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S.Ct. 2704 (1987). However,

> [a]lthough often framed as a right to testify, it is more properly framed as a right to choose whether to testify. The "choice" concept reflects the competing considerations that make up this right; while the Fifth Amendment gives the accused the right to remain silent, courts have recognized that the accused also has the absolute right to break his silence and to testify. This right to choose is personal as well as fundamental, and the defendant must make this decision himself.

(Citations omitted.) *United States v. Ly*, 646 F.3d 1307, 1313 (11th Cir.2011). "[T]he ultimate decision of whether a defendant will testify on his own behalf is the defendant's." *State v. McKay*, 11th Dist. Ashtabula No. 2001-A-0008, 2002-Ohio-3960, ¶ 44. Indeed, counsel acts at his peril by disregarding the defendant's decision to testify:

> [I]f defense counsel refuse[s] to accept the defendant's decision to testify and [does] not call him to the stand, counsel * * * act[s] unethically to prevent the defendant from exercising his fundamental constitutional right to testify. * * * Under such circumstances, defense counsel has not acted "'within the range of competence demanded of attorneys in criminal cases,'" and the defendant clearly has not received reasonably effective assistance of counsel.

(Citations omitted.) *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir.1992). *See United States v. Mullins*, 315 F.3d 449, 453 (5th Cir.2002) ("[I]t cannot be

permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice."). As ultimate responsibility for the decision whether to testify belongs with the defendant and not with counsel, the fact that the defendant was called to testify, taken alone, generally will not support a claim of ineffective assistance of counsel. *See Hesser v. United States*, M.D.Fla. Nos. 2:16-cv-632-FtM-29CM and 2:11-CR-83-FTM-29CM, 2019 WL 2717271, *5 (June 28, 2019) (recognizing the "well established law that the choice as to whether to testify or not is up to a defendant" and concluding that because "it was petitioner's decision to testify, not counsel's, * * * there was no ineffective assistance in calling petitioner as a witness"); *State v. Winstead*, 1st Dist. Hamilton No. C-080092, 2009-Ohio-973, ¶ 16; *McKay* at ¶ 43-44.

{¶33} Yet, a defendant is not completely precluded from bringing an ineffective-assistance claim relating to the fact that he was called to testify at trial. "In cases where a defendant is represented by counsel, counsel is responsible for providing the advice needed to render the defendant's decision of whether to testify knowing and intelligent." *Ly* at 1313, citing *Teague* at 1533. "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Teague* at 1533. Thus, depending on the circumstances, if counsel gave the defendant erroneous, misleading, or incomplete

advice concerning the defendant's right to testify, his right not to testify, and the potential advantages and risks of each choice, the defendant might be able to demonstrate that counsel performed deficiently.[1] *See id.* at 1534 (explaining that counsel's failure to inform a defendant of his right to testify constitutes neglect of a "vital professional responsibility"). Moreover, a claim alleging that counsel overrode the defendant's decision not to testify and "forced the defendant to testify is analyzed under the two-pronged *Strickland* standard." *Singleton v. United States*, 134 F.Supp.3d 807, 812 (D.Del.2015), citing *Palmer v. Hendricks*, 592 F.3d 386, 398-399 (3d Cir.2010) and *Sexton v. French*, 163 F.3d 874, 882 (4th Cir.1998).

{¶34} However, in this case, there is nothing in the record indicating Thompson did not want to testify and that trial counsel overrode his decision. Nor is there anything in the record suggesting that Thompson's trial counsel did not adequately advise Thompson of his rights or of the strategic implications of Thompson's decision whether to testify. Though it appears that Thompson's trial counsel did not advise him on the record concerning these matters, this is not particularly surprising as "[i]t is a normal practice for lawyers to advise their clients in private, rather than on the record." *State v. Bays*, 87 Ohio St.3d 15, 27 (1999). Because we are unable to review the content of the advice Thompson's trial counsel gave to Thompson, we cannot determine whether Thompson's trial counsel's

---

[1] Of course, to sustain a claim of ineffective assistance of counsel, the defendant would still need to demonstrate prejudice.

performance was deficient in this respect. *See State v. Seibert*, 6th Dist. Wood No. WD-02-017, 2003-Ohio-3107, ¶ 12-13 (rejecting as unreviewable defendant's argument that counsel was ineffective for failing to advise him of his right not to testify at trial where counsel's advice, if given, was not put on the record).

**{¶35}** Furthermore, we observe that the trial court engaged in two colloquies with Thompson wherein the trial court informed Thompson that he had a right to testify or not to testify, that the jury could not consider his silence for any reason should he choose not to testify, and that the decision whether to testify was his to make after consultation with counsel. (July 14-17, 2020 Tr. at 674, 682-683). Thompson's counsel stated he was satisfied with the trial court's explanation of Thompson's rights, and Thompson indicated he understood his rights and that it was his decision to testify. (July 14-17, 2020 Tr. at 674, 682-683). In light of these circumstances, Thompson has failed to demonstrate that he received ineffective assistance of counsel with regard to his trial testimony.

**b. Cooper's Testimony**

**{¶36}** Thompson's argument that his trial counsel was ineffective for calling Cooper as a witness fares no better. "[C]ounsel's decisions concerning which witnesses to call at trial fall within the realm of trial strategy and tactics and generally will not constitute ineffective assistance of counsel." *State v. Smith*, 115 Ohio App.3d 419, 426 (3d Dist.1996). "Trial strategy is only deficient if it is

'outside the realm of legitimate trial strategy so as "to make ordinary counsel scoff."'" *In re R.M.*, 7th Dist. Harrison No. 19 HA 0007, 2019-Ohio-5251, ¶ 47, quoting *State v. Taylor*, 5th Dist. Richland No. 2005-CA-0112, 2006-Ohio-4064, ¶ 34. Here, Thompson has neither argued nor established that his trial counsel's decision to call Cooper as a witness was so far outside the range of legitimate trial strategy as to be nonsensical. Consequently, Thompson has not demonstrated that his trial counsel was ineffective in choosing to call Cooper as a witness.

**v. Closing Statements**

{¶37} Finally, Thompson argues he received ineffective assistance of counsel because his trial counsel, while presenting closing statements, asked the jury to return a guilty verdict on the aggravated-possession-of-drugs charge. During his closing statements, Thompson's trial counsel made the following comments:

> I'm going to do something very unusual and ask you to find [Thompson] guilty of the charge of aggravated possession of drugs. And that may seem unusual to you, a defense attorney asking us to find his client guilty. I'm not going to sit here and insult your intelligence and say, "Oh, the drugs found at [Thompson's residence], [Thompson] is not responsible for those." I would be insulting your intelligence, wouldn't I? I'm not going to do that. All right?
>
> The State has proven its case beyond a reasonable doubt as to that charge alone.

(July 14-17, 2020 Tr. at 761). Thompson contends his trial counsel's decision to concede guilt on the aggravated-possession-of-drugs charge "changed the course and result of the trial." We disagree.

-23-

{¶38} "According to the Ohio Supreme Court, '[c]oncessions of guilt, in any form, are among the most troublesome actions a defense counsel can make during representation of a defendant.'" *State v. Villani*, 12th Dist. Butler No. CA2018-04-080, 2019-Ohio-1831, ¶ 37, quoting *State v. Goodwin*, 84 Ohio St.3d 331, 336 (1999). "Nonetheless, concessions do not constitute ineffectiveness per se." *Id.* "[C]oncessions of guilt must be analyzed on a case-by-case basis, considering '[a]ll of the facts, circumstances, and evidence.'" *Id.*, quoting *Goodwin* at 338. "When defense counsel concedes his client's guilt to a charge in an effort to enhance credibility by being candid and realistic with the jury, such a decision may be construed as tactical or strategic and, therefore, does not constitute ineffective assistance of counsel." *State v. Simpson*, 2d Dist. Montgomery No. 19797, 2004-Ohio-669, ¶ 24, citing *Goodwin* at 338-339.

{¶39} After reviewing the entirety of Thompson's trial counsel's closing statements, as well as the evidence in the record, we cannot conclude that Thompson's trial counsel was ineffective for admitting Thompson's guilt to the charge of aggravated possession of drugs. Thompson's trial counsel's decision to partially concede Thompson's guilt was clearly strategic. Based on Thompson's trial counsel's cross-examination of the State's witnesses, the presentation of Thompson's own case, and the rest of the closing statements, in which Thompson's trial counsel insisted that there was no evidence definitively connecting Thompson

to the fentanyl that caused Good's death, it is evident that Thompson's defense was not premised on casting doubt on whether he himself possessed fentanyl. Instead, Thompson's defense was based on countering the State's proof that he knowingly furnished fentanyl to Good. By admitting that Thompson possessed drugs, Thompson's trial counsel attempted to direct the jury's focus to what Thompson's trial counsel believed to be the weakest elements of the State's case. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 60; *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, ¶ 60. Moreover, the admission may have been beneficial in bolstering the credibility of Thompson's defense to the jury, i.e., because Thompson is being forthcoming by admitting that he possessed drugs, he should be believed when he says that he did not give drugs to Good or allow Good to take them. *See Villani* at ¶ 38; *Simpson* at ¶ 24-25. Ultimately, while Thompson's trial counsel's strategy may not have yielded the hoped-for results, Thompson has not demonstrated that the strategy was unreasonable under the circumstances.

{¶40} Thompson's first assignment of error is overruled.

**B. Second Assignment of Error: Are Thompson's convictions supported by sufficient evidence and does the evidence weigh in favor of Thompson's convictions?**

{¶41} In his second assignment of error, Thompson argues his convictions are not supported by sufficient evidence and are otherwise against the manifest weight of the evidence.

**i. Standards for Sufficiency-of-the-Evidence and Manifest-Weight Review**

{¶42} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶43} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶44} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of

witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### ii. Thompson's Offenses

{¶45} Thompson was found guilty of three offenses: involuntary manslaughter, aggravated possession of drugs, and corrupting another with drugs. The most serious of these offenses, involuntary manslaughter, is codified at R.C. 2903.04, which provides, in relevant part, that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). "The culpable mental state of involuntary manslaughter is supplied by the underlying offense." *State v. Johnson*, 8th Dist. Cuyahoga No. 94813, 2011-Ohio-1919, ¶ 54.

{¶46} The predicate felony for Thompson's involuntary-manslaughter charge was aggravated possession of drugs.[2] The offense of aggravated possession of drugs is codified at R.C. 2925.11, which provides, in relevant part, that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). Consequently, the culpable mental state for aggravated possession of drugs, and for involuntary manslaughter in this instance, is "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Therefore, to sustain Thompson's involuntary-manslaughter conviction, the State was required to prove that Thompson caused Good's death as the proximate result of knowingly possessing, obtaining, or using a controlled substance or controlled substance analog.

{¶47} Thompson was also convicted of corrupting another with drugs. The offense of corrupting another with drugs is codified at R.C. 2925.02, which provides, in relevant part, that "[n]o person shall knowingly * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled

---

[2] Although the aggravated-possession-of-drugs offense merged with the involuntary-manslaughter offense at sentencing, in determining whether Thompson's involuntary-manslaughter conviction is supported by the evidence, we must necessarily consider whether the evidence supports the jury's finding that Thompson committed the offense of aggravated possession of drugs.

substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent." R.C. 2925.02(A)(3). Like aggravated possession of drugs, the culpable mental state for corrupting another with drugs is "knowingly," which we defined above. "Furnish" means "'to supply, provide, or equip, for accomplishment of a particular purpose.'" *State v. Price*, 8th Dist. Cuyahoga No. 107096, 2019-Ohio-1642, ¶ 49, quoting *Black's Law Dictionary* 466 (6th Ed.1991).

### iii. Sufficiency of the Evidence

{¶48} Thompson first suggests his involuntary-manslaughter conviction is not supported by sufficient evidence because the State failed to prove that he committed the predicate offense of aggravated possession of drugs. In support of this claim, Thompson observes that "no DNA analysis was conducted to link the baggie of drugs found in [Thompson's] bedroom to [him]."

{¶49} Although Thompson is correct that the baggie of drugs found in his bedroom was not tested for the presence of his DNA, his argument does not account for the ample evidence presented by the State connecting him to the drugs found in his bedroom. During his interviews with law enforcement officers on October 25 and October 29, 2018, Thompson repeatedly admitted that he was in possession of some type of substance on the morning of October 25, 2018. Although Thompson claimed in the interviews that he did not know what the substance was, he expressed

his belief that the substance was probably some variety of illegal drug. Furthermore, during the October 29, 2018 interview, Thompson described where he stored the substance while it was in his possession. During the search of Thompson's bedroom on October 25, 2018, a baggie containing an unknown substance was found in a location consistent with Thompson's description, and subsequent testing revealed that this substance contained fentanyl. Thus, viewing the evidence in a light most favorable to the State, any reasonable trier of fact could find beyond a reasonable doubt that Thompson committed the offense of aggravated possession of drugs.

{¶50} Thompson also maintains his involuntary-manslaughter conviction is not supported by sufficient evidence because "the State was never able to prove that [he] actually furnished or made any drugs available to the victim." While Thompson frames this argument as challenging the sufficiency of the evidence supporting his involuntary-manslaughter conviction, we observe that the State was not required to prove that Thompson furnished or made drugs available to Good in order to obtain a conviction for involuntary manslaughter. The offense of corrupting another with drugs, which requires proof that the defendant furnished the victim with a controlled substance, was not the predicate offense for Thompson's involuntary-manslaughter charge. The predicate offense for Thompson's involuntary-manslaughter charge was aggravated possession of drugs, which does not require proof that the defendant furnished the victim with a controlled substance.

Accordingly, we address Thompson's argument as it relates to a challenge to the sufficiency of the evidence supporting his corrupting-another-with-drugs conviction.

{¶51} Thompson contends the State did not present sufficient evidence that he furnished Good with drugs because "[t]estimony was admitted that [he] was likely unconscious when [Good] came to his residence on October 25, 2018 * * *." He also argues that "no evidence existed connecting the drugs found in the victim's wallet to [him], and certainly no DNA match existed." Yet, Thompson again ignores the State's considerable evidence supporting a finding that he furnished drugs to Good.

{¶52} First, in both of his interviews with law enforcement officers, Thompson recounted the conversation he had with Good on the morning of October 25, 2018, after Good asked about the drugs in Thompson's bedroom. Therefore, construing the evidence in a light most favorable to the State, the evidence supports that Thompson was at least semi-conscious when Good came to his house on the morning of October 25, 2018. However, regardless of Thompson's level of consciousness when Good came to his house on the morning of October 25, 2018, the State presented sufficient evidence that Thompson and Good had prearranged for Good to obtain drugs from Thompson. At trial, the State presented the following series of text messages between Thompson and Good:

[Good]: What happened to u being up lol

[Good]: U going to have a dub at 830

[Thompson]: Yep. I was Out like a Blown out light

[Good]: K

[Good]: See u then

[Thompson]: OK

All of these text messages were sent and received between 1:13 a.m. and 1:41 a.m. on October 25, 2018. In addition, the State presented testimony from a law enforcement officer that, in his experience, a "dub" refers to $20 worth of "[t]ypically heroin, but anything." (July 14-17, 2020 Tr. at 508-509). Another law enforcement officer testified that, based on his experience, Good's text messages to Thompson represented an attempt by Good to obtain drugs. (July 14-17, 2020 Tr. at 638). Accordingly, even if Thompson was unconscious when Good came to his house, the evidence, when viewed in a light most favorable to the State, supports that Thompson had previously agreed to make $20 worth of drugs available for Good when Good arrived on the morning of October 25, 2018.

{¶53} Finally, the State presented sufficient evidence for the jury to find that Thompson did in fact furnish Good with a controlled substance. Specifically, the State presented evidence that the substance found in Good's wallet was similar to the substance seized from Thompson's bedroom in that both substances were

"tannish/peach" in color and contained fentanyl. Given these similarities, the jury could reasonably infer that Thompson was the source of the substance found in Good's wallet.

{¶54} Contrary to Thompson's assertion, this inference is not negated by the apparent absence of his DNA on the baggie that was found inside of Good's wallet. While it is true that Good was identified as the major contributor of a DNA mixture discovered on the baggie and that Thompson was "excluded from the interpretable data," this does not necessarily mean that Thompson's DNA was not on the baggie. The State's DNA report indicated that the DNA mixture discovered on the baggie included additional data that was "not interpretable." The State's expert witness in DNA analysis explained that this signified that "there is additional DNA data, but it is so low that it is uninterpretable," meaning that she "wouldn't be able to include or exclude anyone from that additional data." (July 14-17, 2020 Tr. at 655). She further testified that she could not include or exclude Thompson as a contributor to the DNA mixture. (July 14-17, 2020 Tr. at 655, 662). It is thus possible that Thompson interacted with the baggie found in Good's wallet and that he deposited his DNA thereon, though in an amount insufficient to make a positive identification. Therefore, viewing the evidence in a light most favorable to the State, any reasonable trier of fact could find beyond a reasonable doubt that Thompson

furnished Good with a controlled substance as required to sustain a conviction for corrupting another with drugs.

{¶55} In sum, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of involuntary manslaughter and corrupting another with drugs proven beyond a reasonable doubt. Accordingly, we conclude that Thompson's involuntary-manslaughter and corrupting-another-with-drugs convictions are supported by sufficient evidence.

### iv. Manifest Weight of the Evidence

{¶56} Thompson separately argues that his convictions are against the manifest weight of the evidence. However, in making his manifest-weight argument, Thompson simply rehashes claims he made in his first assignment of error. Thompson again claims his trial counsel was "ineffective for failing to file and argue motions to suppress," that his trial counsel erred by "[c]alling [him] to testify as well as [Cooper]," and that "[a]dmitting to [the] possession charge on closing argument was likely the final link in the destruction of any defense * * *." He maintains it was these supposed missteps by counsel that "caused the jury to lose its way." These are not proper manifest-weight arguments, and in similar circumstances, we have refused to construct, and then analyze, a manifest-weight argument on behalf of the defendant. *See State v. Laws*, 3d Dist. Allen No. 1-20-10, 2021-Ohio-166, ¶ 32 (declining to construct and then resolve a manifest-weight

argument where defendant's manifest-weight argument was nothing more than a restatement of his earlier sufficiency-of-the-evidence argument).

{¶57} Nevertheless, we have little difficulty concluding that Thompson's convictions are not against the manifest weight of the evidence. As discussed throughout this opinion, there is overwhelming evidence that on October 25, 2018, Thompson possessed a substance containing fentanyl. By his own statements, Thompson confirmed that Good was aware of the drugs. There is also substantial evidence supporting that on the morning of October 25, 2018, Good obtained some of the substance and used it after leaving Thompson's house. While Thompson claimed he did not sell or give the substance to Good or make the substance available to him, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Finally, it is undisputed Good overdosed on fentanyl and later died as a result. Thus, Thompson's involuntary-manslaughter and corrupting-another-with-drugs convictions are not against the manifest weight of the evidence.

{¶58} Thompson's second assignment of error is overruled.

## IV. Conclusion

{¶59} For the foregoing reasons, Thompson's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**