[Cite as *State v. Horton*, 2025-Ohio-5103.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

LLOYD B. HORTON, JR.,

    DEFENDANT-APPELLANT.

CASE NO. 1-24-62

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court

Trial Court No. CR2023 0289

Judgment Affirmed

Date of Decision: November 10, 2025

APPEARANCES:

    *Peter Galyardt* and *Melissa Seabolt* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**MILLER, J.**

{¶1} Defendant-Appellant, Lloyd B. Horton, Jr. ("Horton"), appeals from the September 9, 2024 judgment of the Allen County Court of Common Pleas, sentencing him after a jury trial. Horton argues on appeal that the trial court erred in denying his request to suppress the illegal drugs found in his home, his trial counsel was constitutionally deficient in failing to timely move for suppression on *Miranda* grounds, and the jury lost its way in convicting him because its verdict was against the manifest weight of the evidence. For the reasons that follow, we affirm.

## I.      FACTS AND PROCEDURAL HISTORY

{¶2} On September 14, 2023, Horton was indicted on a single count for possession of cocaine, in violation of R.C. 2925.11(A), as a first-degree felony. The charge arose from law enforcement's recovery of cocaine from Horton's father's house, where Horton was living in the basement. According to the State, Horton consented to a search and showed law enforcement where the cocaine was located.

{¶3} On March 10, 2024, the trial court held a hearing on Horton's motion to suppress evidence. Horton argued his consent to the search was not voluntary. Special Agent Andrew Eilerman of the Federal Bureau of Investigations ("Special Agent Eilerman") testified at the hearing. In the summer of 2022, he was a member of a task force investigating Christopher Clary ("Clary"). The task force had reason to believe Clary was trafficking in narcotics and, pursuant to a warrant, they placed a GPS tracker on Clary's vehicle. On August 18, 2022, Clary's vehicle drove to the

Detroit area and back. Upon returning, two people exited the vehicle at Clary's house, Clary and Horton. Horton later left Clary's house, and law enforcement executed a search warrant there and spoke with Clary. Clary informed law enforcement that he had purchased a pound of cocaine during the trip. However, after searching Clary's house and further investigation, they recovered an ounce less than the full pound.

{¶4} Law enforcement then decided to talk to Horton. Six officers from the task force arrived at the house where Horton lived with his father. They did not have a warrant to search the house and had not attempted to obtain one. According to Special Agent Eilerman, on approaching the house, the officers did not have guns drawn and were not even wearing their bullet proof vests. They did not anticipate forcing entry into the home; instead they intended to engage in a "knock and talk." The officers set themselves up around the outside of the house.

{¶5} Special Agent Eilerman knocked on the door and announced that they were law enforcement. Horton's father came to the door. Special Agent Eilerman explained to him who they were, why they were there, and that they wanted to speak to Horton. Law enforcement then spoke with Horton, explained they had recovered some narcotics from Clary's house, some of the drugs were missing, and they asked Horton how much he had. Horton admitted he had an ounce of cocaine. Law enforcement then asked Horton for consent to recover the drugs but explained Horton did not have to give consent. Special Agent Eilerman also explained they

now had enough information to obtain a search warrant. Horton gave them consent to conduct a search, led them to the basement, and recovered the cocaine from behind a ceiling tile.

{¶6} Special Agent Eilerman also testified he did not threaten Horton, did not tell Horton his home would be torn apart if he did not provide consent to search, and did not indicate to Horton that he had a valid search warrant for the home. However, he did tell Horton that law enforcement had executed a search warrant at Clary's house. According to Special Agent Eilerman, law enforcement did not have any guns drawn, Horton was not under arrest, and Horton was not placed in handcuffs.

{¶7} On cross-examination, Special Agent Eilerman said there would have been further discussions about Horton "working with the Task Force," but at the time they had their initial discussion with Horton—during which Horton told them the amount of drugs he had at the house—they had enough information to obtain a search warrant. Special Agent Eilerman added that he is not allowed to decide whether a person will get charged in exchange for cooperation. He also admitted he may have told Horton that "sometimes houses get messy" during a search. (May 10, 2024 Tr. at 29).

{¶8} Horton and his father also testified during the hearing. Some of their testimony conflicted with Special Agent Eilerman's testimony. According to Horton, on the evening in question, he heard shouting outside the house, demanding

he come outside. He saw one officer with his gun drawn. Horton testified that, once officers implied they already knew drugs were inside the house, they asked him what he had. Horton responded that he found some cocaine and was using it. Officers told him, "Well, you need to go in there and get it because we already have a warrant. If you don't comply we'll just go in there and tear your father's house apart." In turn, Horton said, "I don't want my dad's house torn apart. You guys claim to already know what's in there. If you're not going to arrest me or anything as you've claimed then I'll cooperate." Horton's father similarly testified that he overheard the officers say, "If you've got [the drugs] we would like for you to give it up. You don't want us to go in and tear your dad's house apart. We'll search everything." Horton then entered the home with the officers, went to the basement, located the cocaine, and gave it to the officers.

{¶9} According to Horton, the officers also said they were not going to arrest him or charge him with anything. Similarly, Horton's father testified that officers told Horton he was not under arrest and was not going to be charged. All of the witnesses agreed that Horton was not arrested that night, August 18, 2022. As set forth above, Horton was not indicted until more than a year later, on September 14, 2023.

{¶10} The trial court issued a written order denying Horton's motion to suppress. Among other things, the trial court found Special Agent Eilerman's testimony more credible than the defense witnesses on certain subjects. It concluded

that, upon considering all the testimony, Horton voluntarily consented to the search of his basement residence.

{¶11} Two weeks later, Horton's counsel filed a motion for leave to file another motion to suppress, based on the argument that (1) defense counsel learned new information during the motion to suppress hearing, and (2) that new information supported that Horton was in custody at the time he made statements to law enforcement and, therefore, law enforcement committed a *Miranda* violation by not providing *Miranda* warnings and, consequently, the evidence obtained during the search of the basement must be suppressed. The trial court denied the motion for leave, finding that it was not timely filed. The court also noted Horton must have known the alleged "new information" since he was present when the officers came to his house and when he gave a statement to them.

{¶12} A trial took place on July 30 and 31, 2024. Horton was convicted of the cocaine possession charge. The trial court sentenced him to a prison term of four to six years and imposed a mandatory fine. This appeal followed.

II. **ASSIGNMENTS OF ERROR**

{¶13} Horton raises three assignments of error for our review:

**First Assignment of Error**

**The trial court erred when it denied Lloyd Horton, Jr.'s motion to suppress.**

**Second Assignment of Error**

**Trial counsel was constitutionally ineffective.**

-6-

### Third Assignment of Error

**Lloyd Horton, Jr.'s convictions are not supported by the manifest weight of the evidence.**

## III. DISCUSSION

### A. First Assignment of Error

{¶14} In the first assignment of error, Horton argues the trial court erred when it denied his motion to suppress the drugs found during the search of his home. He claims that, contrary to the trial court's finding, his consent to the search was not voluntary because of promises of leniency law enforcement made to him and because of the task force's show of authority.[1]

#### 1. Standard of Review

{¶15} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

---

[1] At the trial court level, Horton made additional arguments in support of his motion to suppress that are not at issue on appeal, such as arguing he was too intoxicated to consent to the search.

### 2. Applicable Law

{¶16} A warrantless search is per se unreasonable under the Fourth Amendment, subject only to a few established exceptions. *State v. Posey*, 40 Ohio St.3d 420, 427 (1988), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). One exception is a search conducted pursuant to consent. *Id.* However, to rely on the consent exception to the warrant requirement, the State must show, by clear and positive evidence, that the consent was freely and voluntarily given. *Id.*; *see also State v. Danby*, 11 Ohio App.3d 38, 41 (6th Dist. 1983) (explaining that the phrase "clear and positive" evidence in this context is the equivalent of proof by "clear and convincing" evidence). "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth* at 228. For example, consent "given because of a threat and/or an unauthorized promise of leniency" is not freely and voluntarily given. *State v. Kovacs*, 1992 WL 292262, *3 (8th Dist. Oct. 15, 1992). Whether a consent to search was voluntary, or instead was the product of duress or coercion (express or implied), is a question of fact to be determined from the totality of the circumstances. *Posey* at 427, citing *Schneckloth* at 227.

### 3. Analysis

{¶17} It is undisputed law enforcement did not have a search warrant for Horton's home. Although the parties dispute whether the consent was voluntary, they do not dispute that Horton gave law enforcement consent to search the

basement and he then showed officers the cocaine hidden in the basement's ceiling tiles.

{¶18} Horton first argues that he only consented to a search of the basement because of a show of authority by task force members, specifically them arriving unexpectedly, some with guns drawn, and threatening "to 'tear up' the home if they had to get a warrant." (Appellant's Brief at 4). In his reply brief, Horton also points out that he testified officers claimed to already have a warrant.

{¶19} However, the trial court highlighted that Special Agent Eilerman testified no one ever told Horton that law enforcement already had a warrant. It further found, "[a]fter listening to all of the testimony and sizing up the believability of those who testified, the Court finds that Eilerman's testimony was more credible than the other witnesses on the subject of whether Eilerman told [Horton] that he already had a search warrant. If the officers already had a search warrant, they would not have had to ask for consent. It was demonstrated clearly and positively that Eilerman did not lie to defendant about having a warrant." (May 14, 2024 Judgment Entry at 7-8).

{¶20} Additionally, concerning the alleged threat to tear up the house, the trial court distinguished between a search made with consent and a search made pursuant to a warrant. It found that, "while Eilerman may have told defendant that execution of a search warrant might have involved 'tearing up' the residence, this was not a threat to coerce the consent—it was honesty." (*Id.* at 9). "[D]efendant

-9-

told the officers where to look in their search of his basement residence," and, "[w]hile defendant testified that he did not want his father's house torn apart, the evidence shows clearly and positively that defendant . . . walked officers to the drugs." (*Id.*). Consequently, the officers did not disturb anything in the home other than the ceiling tiles in their search for the cocaine.

{¶21} Based on our review of the record, the trial court's relevant findings of fact were supported by competent, credible evidence. We also note that Special Agent Eilerman testified that none of the officers had a gun drawn, and Horton's father never mentioned any guns during his testimony. We find no error in the trial court's decision to reject Horton's argument that his consent to the search was not voluntary due to a show of authority by task force members and the alleged threat. *See State v. Elam*, 2003-Ohio-1577, ¶ 17, 22-23 (3d Dist.) (no error in finding consent was voluntary despite all three officers being armed and appellant being told he could not leave the room until after it had been searched); *State v. Sieng*, 2018-Ohio-5103, ¶ 12, 35, 38 (10th Dist.) (no error in finding consent was voluntarily despite appellant's impression his parents' home would be torn up in a search if police were required to seek a warrant).

{¶22} Next, Horton argues he only consented to the search because law enforcement promised leniency, specifically that they promised neither to arrest him nor charge him. Once again, the trial court found Special Agent Eilerman's testimony more credible than the other witnesses. It explained,

-10-

> Eilerman testified that he did not plan to arrest [Horton] when he and other task force members went to [Horton's residence]. He said the task force members went to defendant's residence to talk to defendant. In fact, defendant was not arrested that night. . . . Eilerman also testified that no one told defendant that if he cooperated and gave consent, he would not be charged. Eilerman testified that he is not permitted to make such a promise. . . . No police officer threatened defendant and the Court finds most credible Eilerman's testimony that defendant was not promised that no charges would be filed. Defendant was told he was not going to be arrested and he wasn't arrested. Eilerman talked to defendant about working as an informant, but that did not happen. After the consensual search, the police left.

(May 14, 2024 Judgment Entry at 8). Once again, based on our review of the record, the trial court's findings of fact were supported by competent, credible evidence. Additionally, applying the facts to the legal standard, the trial court did not err in denying the motion to suppress. *E.g., State v. Haycook*, 1975 WL 181166, *2 (10th Dist. Feb. 11, 1975) (affirming denial of suppression motion where there was ample evidence in the record to contradict defendant's contention that he was subjected to pressures and promises of leniency from officers such that his consent was involuntary).

{¶23} Horton's first assignment of error is overruled.

### B.  Second Assignment of Error

{¶24} In the second assignment of error, Horton claims his trial counsel was ineffective in failing to timely file a motion to suppress on *Miranda* grounds. Such a motion would have argued Horton was in custody for *Miranda* purposes, yet law enforcement failed to inform him of his Constitutionally-protected rights against

self-incrimination. According to Horton, the motion therefore would have been successful in suppressing Horton's statements to officers which then led to the evidence found during law enforcement's warrantless search of his residence.

### 1. Applicable Law

{¶25} The appellant has the burden of proving he or she was denied the right to the effective assistance of counsel, because a properly licensed attorney is presumed to carry out his or her duties in a competent manner. *State v. Cartlidge*, 2020-Ohio-3615, ¶ 39 (3d Dist.). To establish ineffective assistance of counsel, the appellant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Tench*, 2018-Ohio-5205, ¶ 264. "Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying this two-pronged test, and the failure to make either showing is fatal to the claim." *State v. Radabaugh*, 2024-Ohio-5640, ¶ 51 (3d Dist.), citing *State v. Conway*, 2006-Ohio-791, ¶ 165, 168.

{¶26} Failure to file a suppression motion does not constitute per se ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). "To sustain a claim of ineffective assistance of counsel based on counsel's failure to file a particular motion, the defendant must first specify the basis for the motion that counsel supposedly should have filed." *State v. Thompson*, 2021-Ohio-2979, ¶

14 (3d Dist.). Next, the defendant must show that the motion had a reasonable probability of success. *Id.* Otherwise, counsel is presumed to have been effective. *Id.*; *see also State v. Nields*, 93 Ohio St.3d 6, 34 (2001).

### 2. Analysis

{¶27} "[T]he requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation." *State v. Dunn*, 2012-Ohio-1008, ¶ 24, citing *Miranda v. Arizona*, 384 U.S. 436 (1966); *Thompson*, 2021-Ohio-2979, at ¶ 16 (3d Dist.) (only custodial interrogation triggers the need for *Miranda* warnings). "'In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave.'" *Thompson*, 2021-Ohio-2979, at ¶ 16 (3d Dist.), quoting *State v. Hoffner*, 2004-Ohio-3430, ¶ 27. Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve the ultimate inquiry of whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Id.* In resolving that ultimate inquiry, courts must consider the totality of the circumstances surrounding the questioning. *Id.* at ¶ 17.

{¶28} Courts have used several factors to assess whether a reasonable person would have believed he or she was free to terminate the interview and leave, including:

(1) What was the location where the questioning took place-i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;

(2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);

(3) Was the defendant's freedom to leave restricted in any way;

(4) Was the defendant handcuffed or told he was under arrest;

(5) Were threats made during the interrogation;

(6) Was the defendant physically intimidated during the interrogation;

(7) Did the police verbally dominate the interrogation;

(8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;

(9) Were neutral parties present at any point during the questioning;

(10) Did police take any action to overpower, trick, or coerce the defendant into making a statement?

*State v. Luke*, 2007-Ohio-5906, ¶ 11 (3d Dist.).  Generally, the factors are each considered as part of the totality of the circumstances and one factor does not control whether a person is in custody for purposes of receiving *Miranda* warnings.  *E.g.*, *Thompson*, 2021-Ohio-2979, at ¶ 27 (3d Dist.) (defendant not in custody even

though the "interview took place inside the decidedly police-dominated environment of a police station"); *Luke*, 2007-Ohio-5906, at ¶ 13 (3d Dist.) (defendant not in custody even though the interview took place in the police station and defendant was a suspect at the time of the interview). This corresponds with the court's duty to consider the totality of the circumstances surrounding the questioning and answer the ultimate inquiry, set forth above.

{¶29} Here, even if law enforcement did not administer *Miranda* warnings[2] and even if Horton's counsel had timely filed the proposed motion to suppress, Horton has not shown that the motion had a reasonable probability of success. Horton relies on the factors set forth above to argue the motion would have been successful. He briefly concedes a number of the factors do not favor finding custodial interrogation, such as that he was at his own house, he was there of his own volition, he was not handcuffed, and his father was present. However, Horton then argues other factors favor a finding that he was in custody. Specifically, he asserts he was suspected of drug possession, six task force members were present, "more than one task force personnel present had their guns drawn," law enforcement made "firm verbal commands," law enforcement made a "threat to 'tear up the house,'" and law enforcement made promises of leniency. (Appellant's Brief at 7). Yet, Horton ignores the trial court's *rejection* of some of those assertions, as

---

[2] The record does not affirmatively indicate whether or not law enforcement administered *Miranda* warnings to Horton. For purposes of deciding this assignment of error, we will assume they did not.

discussed above in our analysis of the first assignment of error. Moreover, the evidence during the suppression hearing did not establish any officers had their guns drawn. Although Horton testified he saw an officer with his gun drawn, Special Agent Eilerman testified that law enforcement *did not* have any guns drawn. We also note the trial court found Special Agent Eilerman's testimony to be more credible than Horton's testimony on several points. Additionally, Horton testified that an officer told him to sit, yet Horton admitted he was having trouble standing (due to his alleged earlier drug use).

{¶30} Turning to the ultimate inquiry, it is undisputed that Horton was not arrested on August 18, 2022. Additionally, in considering the totality of the circumstances surrounding the questioning from an objective perspective based on the record, Horton has not shown there was a restraint on his freedom of movement of the degree associate with a formal arrest. Thus, Horton has not sufficiently shown he was in custody when law enforcement questioned him. Accordingly, law enforcement was not required to provide *Miranda* warnings, and we reject Horton's ineffective assistance of counsel claim. *See State v. Mason*, 82 Ohio St.3d 144, 153-154 (1998) (trial court did not err in finding defendant was not in custody when questioned and, therefore, officers were not required to provide him with *Miranda* warnings); *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 29 (considering the totality of the circumstances, the questioning by law enforcement did not rise to the level of a custodial interrogation requiring *Miranda* warnings).

-16-

{¶31} Horton's second assignment of error is overruled.

**C.** **Third Assignment of Error**

{¶32} In the third assignment of error, Horton argues his drug possession conviction was against the manifest weight of the evidence. In asserting this claim, Horton challenges only one aspect of the evidence, specifically information on a sticker label on State's Exhibit 14—a bag containing cocaine.

**1.** **Standard of Review**

{¶33} The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting" evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524,

¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Const., art. IV, § 3(B)(3).

2. **Analysis**

{¶34} The prosecution offered State's Exhibit 14 as proof of the drugs that Horton surrendered to the task force. Horton argues the exhibit documented the drugs as having been collected at 2:03 p.m. on August 18, 2022, but the drugs collected from Horton's house were collected much later that evening. Horton notes that the task force collected a significant amount of drugs earlier in the day from Clary's house, and there were no pictures of the drugs that Horton surrendered. The State responds that, despite all other information on State's Exhibit 14 being correct (including identifying Horton as the suspect and the case number), the listed time simply was a type-o and the conviction is not against the manifest weight of the evidence.

{¶35} The State's argument is supported by Special Agent Eilerman's testimony during the trial. Special Agent Eilerman testified that he participated in the surveillance of Clary (and, it turned out, Horton) as they drove to the Detroit area and back on August 18, 2022. Significantly, he further testified that Clary and Horton did not return from that trip until 2:39 or 2:40 p.m., i.e., about half an hour after the time indicated on Exhibit 14. The search warrant at Clary's house was not executed until 5:15 p.m. that same day, and law enforcement subsequently went to Horton's house. Additionally, Special Agent Eilerman specifically testified that

-18-

State's Exhibit 14 was a vacuum sealed bag with two smaller plastic bags containing the narcotics Horton recovered from the basement ceiling. Special Agent Eilerman also testified that Horton told him he received an ounce of cocaine from Clary, essentially matching the amount of drugs in Exhibit 14. Finally, we note that Horton's trial counsel basically made this same argument during closing arguments to the jury, and the jury rejected it.

{¶36} Having reviewed the record, weighed the evidence and all reasonable inferences, and considered the credibility of the witness, we find that the jury did not clearly lose its way, and create a manifest miscarriage of justice, in resolving conflicts in the evidence. This is not an exceptional case where the evidence weighed heavily against the conviction.

{¶37} Horton's third assignment of error is overruled.

IV.    CONCLUSION

{¶38} For the foregoing reasons, Horton's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK, P.J. and ZIMMERMAN, J., concur.**

Case No. 1-24-62

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Mark C. Miller, Judge


_____
Juergen A. Waldick, Judge


_____
William R. Zimmerman, Judge

DATED:
/jlm

-20